**In the Matter of Extradition of John Edward BURT to the Federal Republic of Germany, Petitioner-Appellant.**

No. 83–2722.

United States Court of Appeals, Seventh Circuit.

Argued March 26, 1984.

Decided July 2, 1984.

James M. Fergal, Schellinger & Doyle, S.C., Boorkfield, Wis., for petitioner-appellant.

Mel S. Johnson, Asst. U.S. Atty., Milwaukee, Wis., for respondent.

Before BAUER, WOOD and ESCH-BACH, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Petitioner-appellant John Burt appeals from a judgment of the district court denying his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241(c)(3), thus permitting petitioner's scheduled extradition to the Federal Republic of Germany (West Germany) where he is to stand trial for murder. For the reasons stated below, we affirm.

## I.

On March 21, 1965, a West German cab driver, Kurt Pfeuffer, was murdered on the outskirts of Schweinfurt, West Germany. Shortly thereafter, petitioner and another serviceman, Moyer Plaster, who were then stationed with the United States Army near Schweinfurt, left West Germany without Army authorization and traveled to Madison, Wisconsin. There, both men were picked up for a local armed robbery and murder in July of 1965. While in custody at the Dane County jail in Wisconsin, petitioner and Plaster were questioned by Army investigators about the Pfeuffer killing. Petitioner signed a statement under oath confessing to shooting Pfeuffer, and Plaster admitted his involvement as an accessory after the fact. The Army took no further action pending the results of the state criminal proceedings for the Wisconsin murder. On October 25, 1965, Plaster pled guilty to third degree murder for the Wisconsin killing and was sentenced to ten years imprisonment. A week later, petitioner pled guilty to the state's charges of first degree murder and armed robbery, and was given a sentence of life imprisonment for the murder count and up to thirty years on the armed robbery count. After sentencing, the Army filed a detainer[1] against petitioner that was acknowledged by the warden on November 10, 1965.

In December, the Army gave formal notification to West Germany as to the facts regarding the alleged involvement of petitioner and Plaster in the Pfeuffer murder. At that time, the legal relations between the United States and West Germany with regard to crimes committed by American servicemen against West German citizens were governed by portions of the NATO Status of Forces Agreement, *see* Agreement between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces, June 19, 1951, 4 U.S.T. 1792, T.I.A.S. No. 2846 (effective August 23, 1953) ("NATO–SOFA Treaty"), which was extended to West Germany with minor variations by virtue of a subsequent multilateral agreement, *see* Status of Forces Agreement with Respect to Forces Stationed in the Federal Republic of Germany, Aug. 3, 1959, 14 U.S.T. 531, T.I.A.S. No. 5351 (effective July 1, 1963) ("Supplementary Agreement").[2] Under the NATO–SOFA

---

**1.** A detainer is simply a notice to prison officials that charges are pending against the inmate elsewhere and requesting that the custodian notify the sender before releasing the inmate.

**2.** West Germany's status as an occupied territory was dissolved and membership in NATO was conferred in 1955. In 1959, West Germany became a party to the NATO–SOFA Treaty. *See Holmes v. Laird,* 459 F.2d 1211, 1213 & n. 15 (2d

Treaty provisions, West Germany had the primary right to exercise jurisdiction over petitioner because Pfeuffer had been a

West German citizen and the murder occurred off-base and had nothing to do with petitioner's military duties.[3] However, at

Cir.), *cert. denied,* 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972).

The status of forces agreements, such as the NATO–SOFA Treaty, contain provisions that create an implied obligation for the sending state to return an accused serviceman to the host state for prosecution when the host state has been given the primary right to exercise jurisdiction over the accused. *See, e.g.,* NATO–SOFA Treaty, art. 22, par. 3. Not all the status of forces agreements, however, have the status of "treaties" in the constitutional sense (since not all of them have been ratified formally with the advice and consent of the Senate), and at least in the context of extradition, it is well established that the United States government has neither an obligation nor the authority to seize a fugitive citizen and return him or her to a foreign state in the absence of a treaty or statute. *See Valentine v. United States ex rel. Neidecker,* 299 U.S. 5, 9, 57 S.Ct. 100, 102, 81 L.Ed. 5 (1936). The question has thus been raised whether the power of the armed forces to return their members to a foreign state for prosecution rests on grounds different than the general United States laws on extradition. *See, e.g.,* Metzger & McMahon, *The Return of United States Servicemen for Offenses Committed Overseas,* 22 Case W.Res.L.Rev. 617, 622–29 (1971).

Usually this issue does not have to be faced squarely, however, because courts have generally found sufficient indicia of treaty status to provide authorization for the return of servicemen to foreign jurisdictions. The Supreme Court, for example, has recognized the validity of a waiver of criminal jurisdiction by United States military authorities pursuant to an administrative agreement between the United States and Japan (which authorized the implementation of a NATO–like status of forces agreement that, when executed, provided for such waiver), when the administrative agreement had been authorized by the mutual defense treaty in force when the administrative agreement was signed and when the Senate subsequently ratified the NATO–SOFA Treaty with knowledge of the commitment to Japan under the administrative agreement to adopt a similar status of forces agreement. *See Wilson v. Girard,* 354 U.S. 524, 528–29, 77 S.Ct. 1409, 1411–12, 1 L.Ed. 1544 (1957). The serviceman surrendered by the American military in *Girard,* however, was in the territory of Japan, the foreign state, on a United States base, and the decision was premised in part on the principle that the jurisdiction of the territorial sovereign over offenses committed within its borders is exclusive, without the existence of an agreement such as the one there in which Japan had granted the United States the primary right to exercise jurisdiction in certain cases. Thus, the decision in

*Girard* may not be relevant to a case in which the accused has returned to the United States and the foreign state subsequently requests that he or she be delivered to it for prosecution. Still, the agreement between the United States and Japan in *Girard* included no requirement that the serviceman be in Japan at the time of his or her surrender to that country, and several courts have permitted such returns under the belief that the status of forces agreements authorize them. *See, e.g., Holmes v. Laird,* 459 F.2d at 1214, 1216 n. 32 (Supplementary Agreement incorporating NATO–SOFA Treaty); *United States ex rel. Stone v. Robinson,* 309 F.Supp. 1261, 1268–69 (W.D.Pa.), *aff'd,* 431 F.2d 548 (3d Cir.1970) (U.S.–Japan status of forces agreement).

The Supplementary Agreement involved here stems from the Protocol on the Termination of the Occupation Regime in the Federal Republic of Germany, Oct. 23, 1954, 6 U.S.T. 4117, T.I.A.S. No. 3425 (effective May 5, 1955), which contemplated the implementation of a new status of forces agreement based on the NATO–SOFA Treaty and was ratified by the Senate, 101 Cong.Rec. 4232–33 (1955), thus authorizing negotiation by the executive branch and its concurrence in the Supplementary Agreement. *See Holmes v. Laird,* 459 F.2d at 1213 n. 15. Consequently, under *Girard, Holmes,* and *Stone,* the Supplementary Agreement would appear to authorize and oblige the United States to deliver its servicemen to West Germany in particular situations. *See infra* note 12.

3. Article VII of the NATO–SOFA Treaty provides that both the sending state and the host state have the right to exercise criminal jurisdiction over their own members when they commit crimes that are against the laws of their own state. If the offense violates the laws of both states, the right to exercise jurisdiction is concurrent, although the primary right to exercise jurisdiction is given to one or the other state according to a series of rules specified in paragraph 3. Paragraph 3(a) of Article VII provides that when the crime is directed solely against the person or property of another member of the force or civilian component of the sending state (or of a dependent of either category), or when the crime arises out of an act or omission done in the performance of official duty, the sending state has the primary right to exercise jurisdiction. Paragraph 3(b) states that for all other offenses, the primary right to exercise jurisdiction is vested in the host country. Finally, paragraph 3(c) permits the state having the primary right to exercise jurisdiction to waive, at its option, its jurisdiction in favor of the other state to exercise its secondary right to exercise

all times while petitioner was in the Army, the Supplementary Agreement between the United States and West Germany automatically implemented the waiver of primary jurisdiction provisions in paragraph 3(c) of Article VII of the NATO–SOFA Treaty.[4] Supplementary Agreement, art. 19, par. 1. West Germany could, however, recall such waiver in a case in which the exercise of jurisdiction was considered imperative by the West German government by so stating to the American authorities within 21 days after receipt of notification by American officials that an offense by a member or members of the United States armed forces may have occurred. *Id.* at art. 19, par. 3.

In December, 1965, when the Army notified West Germany about the alleged involvement of petitioner and Plaster in the Pfeuffer killing pursuant to the Supplementary Agreement, the Army automatically became vested with the primary right to exercise jurisdiction over them. After being assured by American military authorities that the Army was going to try petitioner and Plaster, the West German government, in a letter dated January 11, 1966, informed the Army that it was not going to invoke its right to recall its waiver of its primary right to exercise jurisdiction within the applicable time period. West German officials, however, did ask the Army to keep them informed of the progress of the American military trials.

On January 9, 1966, the Army charged petitioner with the murder of Pfeuffer pursuant to article 118 of the Uniform Military Code of Justice, 10 U.S.C. § 918, and began procedures to obtain his temporary release from the Wisconsin penitentiary for the court martial. After the release request was obtained in May of 1966, plans for prosecution proceeded. These plans, however, were halted shortly thereafter when the Supreme Court handed down its decision in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), on June 13, 1966. Since the confessions of petitioner and Plaster as to their involvement in the Pfeuffer murder had been obtained in a manner not entirely consistent with the requirements announced in *Miranda,* Army prosecutors concluded that neither petitioner nor Plaster could be successfully court martialed. When the decision not to prosecute was conveyed to West German officials, they expressed great dissatisfaction and sought to recall West Germany's waiver of jurisdiction. The United States Departments of State and Defense, however, jointly made a decision not to return petitioner or Plaster to West Germany because they did not want to set a precedent of allowing West Germany to recall its waiver at such a late date and after the Army had exercised its prosecutorial discretion. Pfeuffer's family was compensated by the United States government. The Army later gave dishonorable discharges to petitioner and Plaster based on their civil convictions in Wisconsin, and no further action was taken by the Army.[5]

After being discharged from the Army, petitioner and Plaster could no longer be returned to West Germany pursuant to the NATO–SOFA Treaty because they were no longer subject to American military authority.[6] In addition, they could not be extrad-

jurisdiction; it also provides that sympathetic consideration should be given to the request of the other country for waiver if the other country considers such waiver to be of particular importance.

**4.** The waiver of the primary right to exercise jurisdiction allows the other state to exercise jurisdiction under its secondary right. Once waiver occurs, the NATO–SOFA Treaty is not explicit as to whether the waiving state thereby permanently divests its right to exercise jurisdiction over the accused. *See* Metzger & McMahon, *supra* note 2, at 638–41. Of course, the waiving state may at some point be able to obtain jurisdiction over the accused by virtue of a separate extradition treaty.

**5.** Prior to discharging the two men, the Army apparently did make an effort to offer Plaster immunity from prosecution for the Pfeuffer murder if he would testify against petitioner. Although Plaster agreed to the deal, the immunity agreement was lost in the mails or by the Army and, due to a further breakdown in communication, the chief military prosecutor concluded that Plaster would not testify and nothing further was done. These events are recounted in the Fourth Circuit's decision in *Plaster v. United States,* 720 F.2d 340 (4th Cir.1983), dealing with West Germany's parallel attempt to have Plaster extradited.

**6.** The NATO–SOFA Treaty recognizes that the authority of a military force to deliver up the

ited as American civilians under the extradition treaty then in existence between West Germany and the United States.[7] Petitioner served twelve years in prison in Wisconsin for the Wisconsin murder, and was paroled in 1977. The next year, a new extradition treaty, The Treaty between the United States and the Federal Republic of Germany Concerning Extradition, July 20, 1978, United States—West Germany, 32 U.S.T.–, T.I.A.S. No. 9785 ("1978 Treaty"), was entered into between the United States and West Germany and became effective on August 29, 1980. Under the 1978 Treaty, each country is obligated to extradite persons found within one country who have committed crimes in the other, including crimes committed before as well as after the date the treaty became effective.

On September 1, 1980, pursuant to the 1978 Treaty, West Germany issued a warrant for the arrest of petitioner and Plaster, and formally requested their extradition on February 12, 1981. As for petitioner, the United States State Department formally accepted the West German government's extradition request on March 23, 1981, and on May 11, 1981, the United States Attorney for the Eastern District of Wisconsin filed a complaint before a magistrate for that district seeking petitioner's arrest and certification of extraditability pursuant to 18 U.S.C. § 3184.[8] The magistrate made findings of fact and determined that the offense alleged fell within the extradition provisions of the treaty, that petitioner was the man sought by West Germany, and that the evidence submitted demonstrated probable cause to believe that petitioner committed the murder. Based on these findings, the magistrate certified petitioner to the Secretary of State for extradition and ordered his arrest.

On October 13, 1981, petitioner filed a petition for a writ of habeas corpus in federal district court.[9] In that petition,

accused is determined by the law of the military. Art. VII, par. 1(a). Under the law of the United States, it is well established that discharge from military service confers on former servicemen jurisdictional immunity from the exercise of military authority. *See United States ex rel. Toth v. Quarles,* 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955).

**7.** The extradition treaty then in existence between the United States and West Germany governing civilians, *see* Extradition Treaty, July 12, 1930, United States—Federal Republic of Germany, 47 Stat. 1862, T.S. No. 836 (effective Apr. 26, 1931), provided under Article II that "Under the stipulations of this Treaty neither of the High Contracting Parties shall be bound to deliver up its own citizens." Treaty language to this effect—that the United States is not bound to deliver up its citizens—had been and has been construed, without more, not to authorize extradition of United States citizens, since the language does not specifically confer a power of extradition to the executive. *See Ryan v. United States,* 360 F.Supp. 264, 265 (E.D.N.Y.) (interpreting Article II provision of United States—West Germany treaty) (citing *Valentine v. United States ex rel. Neidecker,* 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936)), *aff'd without opinion,* 478 F.2d 1397 (2d Cir.1973).

**8.** Under 18 U.S.C. § 3186, the Secretary of State may extradite a person only after that person has been certified by a specified judicial officer to be extraditable under section 3184. Section 3184 provides:

Whenever there is a treaty or convention for extradition between the United States and any

foreign government, any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

18 U.S.C. § 3184. *See infra* note 9.

**9.** No direct review of the magistrate's certification of extradictability under section 3184 is available, since it is not considered a "final order." The proper procedural path for judicial review is by means of a petition for a writ of habeas corpus. *See Collins v. Miller,* 252 U.S.

petitioner claimed that the United States violated his due process rights by attempting to extradite him in accordance with West Germany's request under the 1978 Treaty fifteen years after the United States initially decided not to prosecute him or allow West Germany to obtain his return under the Supplementary Agreement for prosecution in West Germany. In addition, petitioner argued that the government's actions deprived him of a speedy trial as guaranteed by the sixth amendment of the Constitution and Article VII of the NATO–SOFA Treaty, and, finally, that the United States should be estopped from extraditing him for equitable reasons.

The district court first considered the scope of its habeas corpus review and rejected the government's argument that under the Supreme Court's decision in *Fernandez v. Phillips*, 268 U.S. 311, 45 S.Ct. 541, 69 L.Ed. 970 (1925), it could only review the limited issues the magistrate was restricted to addressing under 18 U.S.C. § 3184. The district court observed that *Fernandez* was decided when habeas corpus writs were granted only if the committing court lacked jurisdiction to commit the petitioner. Under the expanded scope of habeas corpus review that has developed subsequently, the court concluded there was no reason why it could not entertain a habeas corpus petition challenging the constitutionality of the government's conduct in seeking the certification of extradition.

The district court then considered petitioner's due process claim regarding prosecutorial delay, but held that this claim was ineffective against the United States because the United States was not acting in the role of prosecutor, but rather in a role analogous to that of a process server for West Germany. In addition, the court found that even if the delay between the time of the offense and the extradition and

charges brought by West Germany could be attributed to the United States and some right analogous to the fifth amendment due process right to be free from unjustified prosecutorial delay existed, the United States had demonstrated that the delay here was justified because to have extradited petitioner in 1967 would have set an adverse precedent.

The district court then disposed of petitioner's other contentions. It held that the sixth amendment right to a speedy trial was not implicated here because that provision applies only to the time period after an arrest or charges are filed. Similarly, the court observed that the Article VII guarantee in the NATO–SOFA Treaty that the party charged shall have a "prompt and speedy trial" in the foreign state could only be raised by petitioner against the West German government and in the West German courts, not in United States courts. Finally, the district court held that it did not have jurisdiction to invoke equitable principles to preclude extradition.

## II.

On appeal, petitioner attacks the denial of the writ of habeas corpus on the grounds that the due process clause of the fifth amendment independently, and as it is purportedly invoked through the terms of the 1978 Treaty, and the "speedy trial" provision of the NATO–SOFA Treaty preclude his extradition. The government urges us not to consider the merits of petitioner's due process claim since that is an issue allegedly not properly considered in a habeas corpus review of extradition proceedings. In all other respects, the government agrees with the district court's disposition of the issues.

We believe the district court was correct in considering the merits of petitioner's due process claim as part of the scope of its habeas corpus review.[10] We

---

364, 40 S.Ct. 347, 64 L.Ed. 616 (1920); *see also Eain v. Wilkes,* 641 F.2d 504, 508 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).

**10.** We disagree with petitioner, however, that the merits of his due process claim are also cognizable under a specific provision of the 1978 Treaty. In support of his position, peti-

tioner relies on Article VII, paragraph 1, of that treaty, which states in relevant part:

> Neither of the contracting parties shall be bound to extradite its own nationals. The competent executive authority of the Requested State, however, shall have the power to grant the extradition of its own nationals if, in its discretion, this is deemed proper to do so

reject the government's position that we are constrained by *Fernandez v. Phillips*, 268 U.S. 311, 45 S.Ct. 541, 69 L.Ed. 970 (1925), to consider only certain questions when an extradition is challenged. In *Fernandez*, Justice Holmes wrote:

> [Habeas corpus] is not a means for rehearing what the magistrate already has decided. The alleged fugitive from justice has had his hearing and habeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offence [sic] charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty.

*Id.* at 312, 45 S.Ct. at 542. Although it is true, as the government points out, that we have referred to the language in *Fernandez* in undertaking habeas corpus review of extradition certifications, *see, e.g., Eain v. Wilkes*, 641 F.2d 504 (7th Cir.), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *In re Assarsson*, 635 F.2d 1237 (7th Cir.1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 325 (1981), these references, as the district court correctly observed, have occurred in cases that have involved challenges to the findings of the magistrate in the magistrate's certification hearing and have not involved constitutional challenges to the conduct of the executive branch in deciding to extradite the accused. In *Eain*, we were faced with deciding only whether the evidence established probable cause to believe the petitioner committed the crimes charged and whether the crimes of which he was accused fell within the terms of the extradition treaty. 641 F.2d at 507. Similarly, in *Assarsson*, the only issues raised were whether the petitioner had actually been charged with the crimes by the country seeking extradition, whether one of the alleged acts was an extraditable offense under the treaty, and whether the evidence established probable cause to believe the petitioner committed the crimes charged. 635 F.2d at 1239, 1244–45. Thus, in those cases, we were not presented with and had no occasion to address a habeas corpus attack challenging, on constitutional grounds, the conduct of the executive branch in deciding to extradite the petitioner, and the references to *Fernandez* must be considered in this light.

When we were later presented with a procedural due process claim in the extradition context in *David v. Attorney General*, 699 F.2d 411 (7th Cir.1983), we intimated that a broader scope of review might be available. In *David*, the petitioner claimed that the district court's refusal to grant him a continuance of the extradition hearing violated his constitutional right to effective assistance of counsel. The government contended that this issue fell outside the scope of review afforded by a habeas corpus petition arising out of an extradition proceeding. We noted, however, that

> there is some authority for the suggestion that the limited scope of review applies only to the extradition ruling and not to procedural issues, *see, e.g., Garcia-Guillern v. United States*, 450 F.2d 1189, 1191 (5th Cir.1971). ("[H]abeas corpus review *of the findings* of a court which conducted an extradition hearing is extremely limited.") Since it appears settled that aliens are entitled to some procedural due process rights in an ex-

---

and *provided the law of the Requested State does not so preclude.*

(Emphasis added.) Although it is true that the authority of the United States to extradite its citizens must arise from, and is governed by, the provisions of an applicable treaty, *see Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 7–9, 57 S.Ct. 100, 101–102, 81 L.Ed. 5 (1936), and that the plain language of the treaty provision referring to the law of the "Requested State" (the United States is the Requested State here) would appear to apply equally to both countries, the diplomatic history reveals that the signato-

ries did not intend that this language incorporate the United States Constitution into the treaty. Rather, an examination of the executive documents accompanying the treaty to the Senate for ratification demonstrates that this language, while written in neutral terms, "was intended to refer only to the part of the West German constitution barring extradition by West Germany of its nationals." *Plaster v. United States*, 720 F.2d 340, 347 (4th Cir.1983). Petitioner has made no arguments that would lead us to a different conclusion.

tradition hearing, *see, Grin v. Shine*, 187 U.S. 181, 184, 23 S.Ct. 98, 99, 47 L.Ed. 130 (1902); *Caltagirone v. Grant*, 629 F.2d 739, 748 fn. 19 (2d Cir.1980); *Rosado v. Civiletti, supra*, 621 F.2d [1179] at 1195 [ (2nd Cir.1980) ], a habeas corpus petition would seem to be the appropriate means of enforcing those rights.

699 F.2d at 415. We did not resolve this issue in *David*, however, because we concluded that the denial of the continuance did not violate the petitioner's constitutional rights.

 We hold that federal courts undertaking habeas corpus review of extraditions have the authority to consider not only procedural defects in the extradition procedures that are of constitutional dimension, but also the substantive conduct of the United States in undertaking its decision to extradite if such conduct violates constitutional rights. Such a view recognizes, as the district court did here, that the broad language of *Fernandez*, which on its face would appear to restrict the scope of inquiry here, must be construed "in the context of its time and in the context of subsequent development of the scope of habeas corpus review." Only subsequent to *Fernandez* did the Supreme Court substantially redefine the scope of habeas corpus review, which previously had been tied to an examination of jurisdictional defects, to include an evaluation of whether the petitioner is being held in violation of any of his or her constitutional rights. *See* C. Wright, Law of Federal Courts 239 (3d ed. 1976). We agree with the Fourth Circuit, which addressed a similar issue in an appeal involving Plaster, that the language in *Fernandez* should not be strictly applied to prohibit review of due process challenges:

> It is critical to note ... that neither *Fernandez v. Phillips* nor the cases that have followed it have considered the scope of habeas corpus in connection with a claim that the actions of the United States government in extraditing the petitioner would violate his constitutional rights. It is well-settled, however, that the United States government must, in carrying out its treaty obligations, conform its conduct to the requirements of the Constitution, and that treaty obligations cannot justify otherwise unconstitutional governmental conduct. *See Reid v. Covert*, 354 U.S. 1, 16–19, 77 S.Ct. 1222, 1230–32, 1 L.Ed.2d 1148 (1957) (plurality opinion); *In re Aircrash*, 684 F.2d 1301, 1308–09 (9 Cir.1982); *Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.*, 651 F.2d 800, 813 n. 20 (1 Cir.1981); *Rosado v. Civiletti*, 621 F.2d 1179, 1195–96 (2 Cir.), *cert. denied*, 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980); *Edwards v. Carter*, 580 F.2d 1055, 1058 (D.C.Cir.), *cert. denied*, 436 U.S. 907, 98 S.Ct. 2240, 56 L.Ed.2d 406 (1978); *Holmes v. Laird*, 459 F.2d 1211, 1217 (D.C.Cir.) (specifically holding that the United States Constitution overrides the SOFA Treaty and the USA–FRG Supplementary Agreement), *cert. denied*, 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972); *Bell v. Clark*, 437 F.2d 200, 203 (4 Cir.1971) (testing treaty against Constitution).

> . . . .

> [A]lthough the Secretary of State and the President have the discretion *not* to extradite an individual for any reason whatsoever, including, for instance, a concern as to deficiencies in the judicial process in the requesting country, *see Eain v. Wilkes*, 641 F.2d 504, 508 (7 Cir.), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Collier v. Vaccaro*, 51 F.2d 17, 20 (4 Cir.1931), they may not choose to extradite an individual where such extradition would, in the opinion of the judiciary, violate the individual's constitutional rights.

*Plaster*, 720 F.2d at 348, 349.

The correctness of this view is readily apparent. As explained succinctly by Justice Black, the United States government "is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution." *Reid v. Covert*, 354 U.S. 1, 5–6, 77 S.Ct. 1222, 1224–1225, 1 L.Ed.2d 1148 (1957). Thus, while it has long been recognized that "a surrender of an American citizen required by treaty for purposes of a

foreign criminal proceeding is unimpaired by an absence in the foreign judicial system of safeguards in all respects equivalent to those constitutionally enjoined upon American trials," *Holmes v. Laird,* 459 F.2d 1211, 1219 (D.C.Cir.), *cert. denied,* 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972) (footnote omitted),[11] when the conduct of the United States government is challenged, such conduct must be assessed in light of the Constitution. The district court had the authority to assess the constitutional challenges to that conduct here because such challenges are within the scope of habeas corpus review. *Plaster,*

720 F.2d at 348 (citing U.S. Const. art. I, sec. 9, cl. 2, and 28 U.S.C. § 2241(c)(3)).

### III.

We turn now to the question whether the conduct of the United States government here violated petitioner's due process rights. The actions by the United States in 1966 can be broken down into those involving the prosecutorial decisions by the Army not to court martial petitioner, and those involving the diplomatic decision by the executive branch not to return petitioner thereafter to West Germany for trial under the Supplementary Agreement.[12] It is the

**11.** The reasoning behind this position was explained in *Neely v. Henkel,* 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901). There, the Court wrote that the foreign proceedings are not to be tested by our own constitutional safeguards because those safeguards "have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country." *Id.* at 123, 21 S.Ct. at 307. Merely because the fugitive is a United States citizen "does not give him an immunity to commit crime in other countries, nor entitle him to demand, of right, a trial in any other mode than that allowed to its own people by the country whose laws he had violated and from whose justice he has fled." *Id.* *But cf. Rosado v. Civiletti,* 621 F.2d 1179, 1197–98 (2d Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980) (petitioner incarcerated under federal authority pursuant to a foreign conviction cannot be denied all access to a United States court when he or she presents a persuasive showing that the conviction was obtained without the benefit of any due process whatsoever); *Gallina v. Fraser,* 278 F.2d 77, 79 (2d Cir.), *cert. denied,* 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960) (presumption of fairness routinely accorded to foreign state's criminal process may be more closely scrutinized if relator demonstrates that the extradition would expose him or her to procedures or punishment "antipathetic to a federal court's sense of decency").

**12.** It is unclear under the Supplementary Agreement incorporating the waiver provisions of the NATO–SOFA Treaty whether West Germany, once it failed to recall its waiver, was thereafter permanently divested of the right to exercise its jurisdiction even though the United States failed to prosecute. The treaty does not explicitly provide for this situation, although most commentators, while recognizing several strong arguments to the contrary, would conclude that West Germany could not reassert jurisdiction under such circumstances. *See, e.g.,* Metzger & McMahon, *supra* note 2, at 640–41; Rouse & Baldwin, *The Exercise of Criminal Jurisdiction*

under the NATO Status of Forces Agreement, 51 Am.J.Int'l L. 29, 48–50 (1957); Schuck, *Concurrent Jurisdiction under the NATO Status of Forces Agreement,* 57 Colum.L.Rev. 355 *passim* (1957); *but see* Note, *Criminal Jurisdiction over American Armed Forces Abroad,* 70 Harv.L.Rev. 1043, 1062–63 (1957). Judging by the actions of the United States State Department and Department of Defense, it appears as if their view was that West Germany's waiver, once executed, was complete, and the United States was thereafter not obligated under the treaty to return petitioner to West Germany for prosecution.

There is some question, in fact, whether the United States was authorized to return petitioner to West Germany *even if* West Germany had not waived its primary right to exercise jurisdiction. According to some commentators, the history of the negotiations of the Supplementary Agreement to the NATO Status of Forces Agreement with Respect to Forces Stationed in the Federal Republic of Germany "clearly indicates that the parties to that agreement understood it to be strictly territorial in scope and to create no obligations effective outside the territory of the Federal Republic of Germany." Metzger & McMahon, *supra* note 2, at 634 (citing Text of Negotiating History of NATO Status of Forces Supplementary Agreement with Germany 443, 857 (1963) (computer generated text prepared by the Air Force Accounting and Finance Center)). *See also* Norton, *United States Obligations under Status of Forces Agreements: A New Method of Extradition?,* 5 Ga.J.Int'l & Comp.L. 1, 35–38 (1975). This view, however, does not comport with the District of Columbia Circuit's decision in *Holmes,* which permitted American military authorities to return servicemen to West Germany to serve their convictions there after they had escaped to the United States prior to final disposition of their case in the West German appellate courts. *See* 459 F.2d at 1219 n. 59. The *Holmes* court, however, did not investigate the legislative history of the Supplementary Agreement since no argument was made that it did not permit return because of jurisdictional problems.

latter diplomatic decision that purportedly prevented petitioner from being timely prosecuted and that would make it fundamentally unfair for the government to extradite petitioner at the request of West Germany fifteen years later under the 1978 Treaty.

The 1978 Treaty itself contemplates no restriction on who may be extradited because too much time may have elapsed since the commission of the crime. The treaty explicitly states that it is to be applied retroactively to encompass crimes committed before the date the treaty became effective. Petitioner asserts, however, that the due process clause of the fifth amendment imposes such a restriction. Petitioner points specifically to the Supreme Court's recognition that "the Due Process Clause has a limited role to play in protecting against oppressive [preindictment] delay." *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977). As the district court noted, however, this right arises in the context of criminal prosecutions by the government. Had the United States somehow attempted to prosecute petitioner at this late date, *Lovasco* would most likely apply to prevent such a prosecution from taking place. The situation here, however, is different. The United States is not attempting to prosecute petitioner, but to extradite him pursuant to the request of West Germany under the 1978 Treaty and in accordance with the discretion in foreign affairs vested in the executive branch. *Cf. Jhirad v. Ferrandina*, 536 F.2d 478, 485 n. 9 (2d Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976) (sixth amendment's guarantee to a speedy trial is limited by its terms to criminal prosecutions, and thus is inapplicable to international extradition proceedings). As we see it, therefore, the real issue is whether there exists a due process right analogous to the one articulated in *Lovasco* that makes it fundamentally unfair for the United States to decide not to return a serviceman pursuant to a status of forces agreement and then subsequently decide to extradite him pursuant to a separate extradition request after considerable time has transpired.

■ We conclude that no such right exists. We view the role of the executive branch as prosecutor and as extraditer as implicating different standards of conduct vis-a-vis a criminal accused. While it may be fundamentally unfair for the government as enforcer of its criminal statutes to compel an accused to respond to and stand trial for charges when the government's delay in bringing the charges has resulted in actual prejudice to the accused, *see Lovasco*, 431 U.S. at 790, 97 S.Ct. at 2049, we do not believe that the government necessarily acts unfairly when as extraditer it makes decisions responsive to diplomatic concerns that may secondarily affect the accused's ability to respond to criminal charges brought by a foreign state. The "unfairness" that prevents the former stems from the special prosecutor-defendant relationship that has been created. That relationship, however, did not exist when the United States made its decision not to return petitioner in 1966 or when it decided to honor West Germany's request to extradite petitioner under the 1978 extradition treaty.

■ Although we recognize the hardship to petitioner that may result should the West German courts permit him to be subjected to prosecution at this late date, we cannot say that the actions by the United States in 1966, combined with the manner in which it has joined the extradition effort here, have in any way violated fundamental conceptions of fair play and decency that inform the due process clause of the fifth amendment. To say that the government would be acting unfairly if it were allowed to prosecute an accused after a lengthy preindictment delay is not to say that the same government acts unfairly in extraditing an accused even if the government has previously refused to return the fugitive under a status of forces agreement [13] and

---

**13.** As noted *supra* at note 12, there is some question as to whether the United States even had the power to return petitioner to West Germany under the Supplementary Agreement based on the facts here, although the United States clearly thought that it did have that power.

much time has elapsed. We hold that no standards of fair play and decency sufficient to trigger due process concerns are automatically implicated when, in undertaking its foreign policy mission, a governmental extradition decision subjects a citizen accused of committing crimes in a foreign jurisdiction to prosecution in the foreign state after a substantial time has elapsed since the commission of the crime. We are reminded that before placing constraints on the executive branch's foreign policy decisionmaking, "we must move with the circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our international relations." *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 383, 79 S.Ct. 468, 486, 3 L.Ed.2d 368 (1959). To constrain the government by placing on it the duty to undertake its extradition decisions with an eye not only toward the legitimate international interests of the United States as determined by the branch charged with that responsibility, but also toward the prejudice that might result to an individual accused because of the amount of time that has elapsed, would be to distort the aims of the diplomatic effort. After all, the actions of the United States in extraditing someone do not result primarily from a desire to try the accused; it is the foreign state that is the instigator of the prosecutorial action.

■ Generally, so long as the United States has not breached a specific promise to an accused regarding his or her extradition, *see Plaster*, 720 F.2d at 352; *Petition of Geisser*, 554 F.2d 698, 704–06 (5th Cir. 1977); *Petition of Geisser*, 627 F.2d 745, 750 (5th Cir.1980), *cert. denied*, 450 U.S. 1031, 101 S.Ct. 1741, 68 L.Ed.2d 226 (1981), and bases its extradition decisions on diplomatic considerations without regard to such constitutionally impermissible factors as race, color, sex, national origin, religion, or political beliefs, and in accordance with such other exceptional constitutional limitations as may exist because of particularly attrocious procedures or punishments employed by the foreign jurisdiction,[14] *cf. Ro-*

sado v. Civiletti, 621 F.2d 1179, 1197–98 (2d Cir.), *cert. denied*, 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980); *Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir.), *cert. denied*, 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960), those decisions will not be disturbed. Here, petitioner's due process argument has not pointed to any conduct by the United States that would run afoul of the constitutional limitations on extraditions we have suggested. Petitioner will have to make his arguments about prejudicial prosecutorial delay in the courts of the prosecuting party, West Germany.

### IV.

■ Petitioner also claims that the NATO–SOFA Treaty in existence when he was a serviceman (and during the time the Pfeuffer murder was committed) afforded him the right to a speedy trial that will be abrogated if the United States is allowed to extradite him to West Germany now. Article II of the NATO–SOFA Treaty provides in relevant part:

9. Whenever a member of a force or civilian component or a dependent is prosecuted under the jurisdiction of a receiving state he shall be entitled—

(a) to a prompt and speedy trial; ....

We note initially that it is questionable whether the provisions of the NATO–SOFA Treaty are even applicable here, since it would appear that West Germany's jurisdiction over petitioner attached pursuant to the 1978 Treaty, and not the NATO–SOFA Treaty. But even assuming the "prompt and speedy trial" provision of the NATO–SOFA Treaty is somehow implicated here and that it can somehow be interpreted to cover delay *prior* to the filing of charges, *cf. United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) (speedy trial clause of the sixth amendment inapplicable to preindictment delay), that provision governs the actions of the *prosecuting* state, which here is West Germany (the receiving state), and not the United States.

---

**14.** Of course, in proceeding with an extradition, the United States must also comply with the terms of the extradition treaty and the proce-

dures prescribed in 18 U.S.C. § 3184. *See supra* note 8.

That right is consequently not enforceable by the United States courts. *See Neely v. Henkel,* 180 U.S. 109, 123, 21 S.Ct. 302, 307, 45 L.Ed. 448 (1901); *supra* note 11. Furthermore, even assuming that West Germany's request for extradition of petitioner constitutes a breach of the treaty provision, it is well settled that the recourse for such a treaty violation in these circumstances is diplomatic, not judicial. *See Charlton v. Kelly,* 229 U.S. 447, 473, 33 S.Ct. 945, 954, 57 L.Ed. 1274 (1913); *Escobedo v. United States,* 623 F.2d 1098, 1107 (5th Cir.), *cert. denied,* 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980); *Peroff v. Hylton,* 563 F.2d 1099, 1102 (4th Cir. 1977); *Holmes v. Laird,* 459 F.2d 1211, 1222 (D.C.Cir.), *cert. denied,* 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972).

### V.

The denial of the writ of habeas corpus is affirmed.