John P. SAHAGIAN, Plaintiff-Appellant,

v.

The UNITED STATES of America, et al., Defendants-Appellees.

No. 87–1881.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 7, 1987.

Decided Dec. 19, 1988.

Chris Averkiou, Chicago, Ill., for plaintiff-appellant.

Linda Wawzenski, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for defendants-appellees.

Before CUMMINGS, CUDAHY and MANION, Circuit Judges.

MANION, Circuit Judge.

John Sahagian filed suit alleging that he was arrested and imprisoned in Spain pursuant to an unconstitutional extradition treaty. The district court dismissed his complaint for failure to state a claim upon which relief can be granted. We affirm.

## I.

On June 24, 1983, an FBI Special Agent filed a criminal complaint in the United States District Court for the Northern District of Illinois charging Sahagian with attempted extortion in violation of 18 U.S.C. § 875(b). That same day a United States Magistrate issued a warrant for Sahagian's arrest. The arrest warrant was based upon an affidavit submitted under oath by an FBI Special Agent. The affidavit alleged that Sahagian, a United States citizen and resident of Illinois, had taken his four children from the family home in Illinois on June 13, 1983, without his wife's permission. Sahagian had not been heard from, the affidavit stated, until he telephoned his parents in Illinois from Madrid, Spain, on June 23, 1983, and then again on June 24, 1983. According to the affidavit, Sahagian (who had apparently been robbed) threatened to "destroy himself and his children" unless his parents wired him $10,000.

A Department of Justice official soon contacted Spanish authorities to obtain Sahagian's provisional arrest pursuant to Article XI of the Treaty on Extradition Between the United States of America and Spain, May 29, 1970, 22 U.S.T. 737, T.I.A.S. No. 7136, *as amended*, Jan. 25, 1975, 29 U.S.T. 2283, T.I.A.S. No. 8938 (the "Treaty").[1] Article XI of the Treaty provides

---

1. Article XI of the Treaty as amended provides:
 A. In case of urgency a Contracting Party may apply to the other Contracting Party for the provisional arrest of .the person sought pending the presentation of the request for extradition through the diplomatic channel. This application may be made either through the diplomatic channel or directly between the respective Ministries of Justice.
 B. The application shall contain a description of the person sought, an indication of intention to request the extradition of the person sought and a statement of the existence of a warrant of arrest or a judgment of convic-

that in cases of "urgency" either party to the Treaty may apply for the provisional arrest of a person pending the presentation of a request for extradition through diplomatic channels. An application for a provisional arrest is required to contain a description of the person sought, an indication of intent to extradite, a statement of the existence of an arrest warrant, and such "further information, if any, as may be required by the requested Party." Article XI further provides that a person "shall be set at liberty" if an extradition request and supporting documents are not received within 45 days after the embassy of the country seeking extradition is informed of the arrest of the person sought to be extradited. The Treaty does not set forth any specific procedures by which a person may challenge his provisional arrest or extradition in either the United States or Spain. Rather, Article IX of the Treaty [2] provides that the person sought to be extradited is entitled to such "remedies and recourses" as are available by the law of the requested country.

After Sahagian was arrested and imprisoned in Spain on June 22, 1983, the United States filed a formal extradition request. The extradition request was supported by the affidavits of two additional FBI Special Agents and an Assistant United States Attorney. Sahagian was brought back to the United States on August 16, 1983. On August 19, 1983, a United States Magistrate dismissed the charges against him. (The parties do not explain on appeal exactly why the charges were dropped.)

Once the criminal charges against him were dropped, Sahagian turned his attention to the three FBI Special Agents, Assistant United States Attorney, and Department of Justice official who were involved in his arrest and extradition. Sahagian filed a pro se complaint against those officials that sought relief under a variety of legal theories and was peppered with terms such as "malice," "purposeful," and "conspiracy." The thrust of the somewhat confusing factual allegations in the complaint appeared to be that the FBI agents acted negligently by taking sides with Sahagian's relatives in a "great family conflict" and by seeking an arrest "with little known facts about the parties seeking [Sahagian's] detention" and "little and poor investigation in regards to these parties and the complete circumstances." The complaint also alleged that the defendants were guilty of "negligence of their expertise" by allowing Sahagian's relatives to believe that Sahagian would only be in jail for a short time before returning from his Spanish "vacation."

The district court then appointed an attorney for Sahagian. Sahagian's attorney filed an amended complaint that added the United States and Spain as defendants. The complaint contained two claims. First, the complaint alleged that the Treaty was unconstitutional because it allowed him to be arrested and detained in violation of his constitutional rights. Among other reasons, the complaint contended the Treaty was unconstitutional because it "contains no provisions for notice, opportunity to be heard, right to counsel or preliminary hearing for the accused subject to provisional arrest." The complaint further alleged that the federal officials knew or should have known that the Treaty was unconsti-

tion or sentence against that person, and such further information, if any, as may be required by the requested Party.

C. On receipt of such an application the requested Party shall take the necessary steps to secure the arrest of the person claimed.

D. A person arrested upon such an application shall be set at liberty upon the expiration of 45 days from the date when the Embassy of the country seeking extradition is informed through diplomatic channels of the fact of this arrest if a request for his extradition accompanied by the documents specified in Article X shall not have been received. However, this stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request is subsequently received.

2. Article IX of the Treaty provides:

The determination that extradition based upon the request therefor should or should not be granted shall be made in accordance with this Treaty and with the law of the requested Party. The person whose extradition is sought shall have the right to use such remedies and recourses as are provided by such law.

tutional. Second, Sahagian claimed that the defendant federal officials should be held liable for procuring his arrest and extradition based on unreliable hearsay that they knew or should have known was false. Sahagian sought $1 million in damages from Spain, $1 million in damages from the defendant federal officials, and a judgment declaring the Treaty was unconstitutional.

The federal defendants filed a motion to dismiss which the district court granted. Spain never appeared in district court and, at oral argument on appeal, Sahagian's attorney wisely stated that Sahagian was no longer pressing his claims against Spain for the violation of his rights guaranteed by the United States Constitution. See 28 U.S.C. §§ 1602 through 1611 (Foreign Sovereign Immunities Act).

Sahagian filed a motion for the district court to reconsider the dismissal of the federal defendants and a motion for leave to amend his complaint. The district court denied both motions and this appeal followed.

## II.

There are three issues on appeal: (1) whether Sahagian is entitled to relief against the federal officials based on his claim that the Extradition Treaty is unconstitutional; (2) whether Sahagian is entitled to relief based on his claim that the defendant federal officials acted beyond and abused their official authority in violation of his Fifth Amendment rights; and (3) whether the district court had personal jurisdiction over the defendant federal officials. Sahagian makes no argument on appeal based on any claimed violation of his Fourth Amendment rights.

In addition, Sahagian has implicitly abandoned any claims asserted directly against the United States. Apparently relying on the federal government's sovereign immunity, *see United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed. 2d 607 (1980), the district court characterized Sahagian's claims as a "constitutional tort" suit brought against the named federal officials in their personal capacities un-

der the rule enunciated in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *See Clark v. Library of Congress,* 750 F.2d 89, 102–03 (D.C.Cir.1984) (sovereign immunity does not bar *Bivens* actions brought against federal officials in their personal capacities). The only objection Sahagian has to this characterization of his action is that he claims that he is also entitled to relief against the defendant federal officials in their official capacities. Sahagian cites to *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), for the proposition that sovereign immunity does not bar his claims against the federal officials sued in their official capacities. In *Larson,* the Court held that, in cases where specific relief is sought, a suit against a federal official would not be deemed a suit against the United States if the suit sought relief against a federal official for: (1) actions beyond the official's statutory authority; or (2) actions that are unconstitutional even if the actions are within the official's statutory authority. *Id.* at 689–90, 69 S.Ct. at 1461–62. *See generally Clark v. United States,* 691 F.2d 837, 839–40 (7th Cir.1982). The question of whether the the federal officials could also be sued in their official capacities, however, is one we need not resolve. Either way, Sahagian's complaint was properly dismissed.

## III.

According to Sahagian, Article XI of the Treaty is unconstitutional because it allows federal officials to procure the arrest and detention of an American citizen traveling abroad without due process of law or an indictment by a grand jury. Sahagian also claims that the Treaty is unconstitutional because it does not require that Spain grant him notice of the charges against him, the right to counsel, the opportunity to challenge his arrest and extradition in the Spanish courts, and the right to a hearing to determine reasonable bail.

These contentions are plainly lacking in merit.[3]

It is well settled that the Bill of Rights limits both the federal government's treaty-making powers as well as actions taken by federal officials pursuant to the federal government's treaties. *See Reid v. Covert,* 354 U.S. 1, 16–19, 77 S.Ct. 1222, 1230–31, 1 L.Ed.2d 1148 (1957) (plurality opinion); *Matter of Extradition of Burt,* 737 F.2d 1477, 1484–87 (7th Cir.1984); *Plaster v. United States,* 720 F.2d 340, 348 (4th Cir. 1983). Thus, to the extent Sahagian challenges the procedures under which the federal officials procured his arrest and extradition, those procedures "must be assessed in light of the Constitution." *Burt,* 737 F.2d at 1485. *See also Rosado v. Civiletti,* 621 F.2d 1179, 1195–96 (2d Cir.) (stating that while the Constitution does not limit the criminal procedures employed by another country, it does limit the manner in which the United States "may join the effort"), *cert. denied,* 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980). But the procedures set forth in Article XI did not deprive Sahagian of any constitutional rights. As contemplated by Article XI, the federal officials obtained Sahagian's provisional arrest and detention pending extradition after obtaining an arrest warrant from a magistrate based upon a showing of probable cause. This clearly falls within constitutional bounds. *See Gerstein v. Pugh,* 420 U.S. 103, 113–16, 95 S.Ct. 854, 862–64, 43 L.Ed.2d 54 (1975).[4]

 Sahagian nonetheless argues that Article XI violates the Fifth Amendment because it allows federal officials to procure the provisional arrest of a person without first obtaining an indictment by a grand jury.[5] This argument has absolutely no merit. There is no constitutional requirement that a federal official seek an indictment before arresting and detaining a person. *See generally Gerstein,* 420 U.S. at 113–16, 95 S.Ct. at 862–64; *see also* Fed.R.Crim.P. 4 through 7; Wright *Federal Practice and Procedure: Criminal Second* § 121 (2d ed. 1982). Sahagian apparently confuses an extradition proceeding with a criminal prosecution. Extradition is simply a procedure by which one sovereign nation turns over custody of a person pursuant to a request from another sovereign nation. As such, the courts have routinely rejected arguments that extradition proceedings are "criminal prosecutions" subject to all the rights attendant to such proceedings. *See, e.g., Burt,* 737 F.2d at 1486; *Jhirad v. Ferrandina,* 536 F.2d 478, 484–85 & n. 9 (2d Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976). The fact that a person's stay in prison pending extradition may be unpleasant

---

3. The defendant federal government officials did not raise the defense of qualified immunity in their motion to dismiss. Instead, they only argued that they were not subject to damages because the Treaty was constitutional. Given that the defendants moved to dismiss on the grounds the Treaty was constitutional, we see no reason why they did not also interpose a qualified immunity defense at that time. This would have avoided any potential duplication of effort by the district court. It might also have given Sahagian a much more realistic outlook as to his chances of recovery against the individual defendants.

4. There is some tension among the cases over whether a foreign country must show full probable cause for arrest before a person may be arrested and detained by the United States pursuant to an application for provisional arrest. *Compare Matter of Extradition of Russell,* 805 F.2d 1215, 1217 (5th Cir.1986) (holding that Colombian government made showing of probable cause to justify provisional arrest while indicat-

ing that full showing of probable cause may not be necessary to justify provisional arrest) *with Caltagirone v. Grant,* 629 F.2d 739, 748 (2d Cir. 1980) (holding that provisional arrest procedures of extradition treaty required Italian government to show probable cause for arrest while indicating that evidence at provisional arrest stage could be informal). Because there was a showing of probable cause to support Sahagian's arrest and detention, we need not venture into this debate or decide whether the debate even has any applicability when the United States seeks the provisional arrest and detention of a person.

5. Sahagian's brief is somewhat cryptic as to whether he contends that the time period under which he could be held for extradition under the Treaty is, in and of itself, unconstitutional. At oral argument, however, he made clear that he was not challenging the length of time he was held but rather the alleged failure of the Treaty to contain constitutionally adequate procedures.

does not mean that a person has been "held to answer" for a crime within the meaning of the Fifth Amendment. Moreover, there is nothing in the Treaty that deprives a person of any rights afforded criminal defendants once they are placed in the custody of the United States.

Sahagian's remaining challenges to the Treaty are that it is unconstitutional because it does not guarantee that Spain give him notice of the charges, the opportunity to challenge his arrest and extradition in the Spanish courts, the right to counsel, and the right to bail.[6] These claims are based on the mistaken premise that the United States has either the right or the power to insist that the Spanish courts comply with the United States' laws concerning extradition proceedings or criminal procedure. However, as the Supreme Court noted long ago, "No principle of general law is more universally acknowledged, than the perfect equality of nations.... It results from this equality, that no one can rightfully impose a rule on another." *The Antelope*, 23 U.S. (10 Wheat) 66,122, 6 L.Ed.. 268 (1825). Stated another way, "[i]t is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation. Such an assumption would directly conflict with the principle of comity upon which extradition is based." *Jhirad*, 536 F.2d at 484–85. This principle is most often applied in cases where the courts have held that a person cannot defeat his extradition to a foreign country on the ground that his trial in the country requesting extradition will not contain all the safeguards guaranteed by the Bill of Rights.

*See Neely v. Henkel*, 180 U.S. 109, 122, 21 S.Ct. 302, 307, 45 L.Ed. 448 (1901); *Burt*, 737 F.2d at 1487–88; *Jhirad*, 536 F.2d at 484–85; *Holmes v. Laird*, 459 F.2d 1211, 1217–18 (D.C.Cir.), *cert. denied*, 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972). But this principle of comity between nations is equally applicable to cases where a person claims to have been denied constitutional rights in a foreign extradition proceeding. *See Hall v. Patterson*, 45 F. 352, 356 (C.C.D.N.J.1891). It is hardly reasonable to expect the courts of Spain (or the United States) to constantly alter the procedures under which it conducts extradition proceedings depending upon the citizenship of the person sought to be extradited. And it is difficult to see how, as a practical matter, any such treaty provisions could be enforced. We recognize that, like most legal principles, the principle of comity is not without exceptions. The Constitution may impose some limitations upon extradition decisions in exceptional cases due to some "particularly atrocious procedures or punishments employed by the foreign jurisdiction...." *Burt*, 737 F.2d at 1487. But merely detaining an individual pending his extradition to the United States certainly does not present such a case.

## IV.

Sahagian also alleged in his complaint that his Fifth Amendment rights were violated because "the individual defendants acted beyond and abused their official authority." Complaint at 5. Sahagian, however, does nothing on appeal with this allegation other than repeat it in varying forms in his brief without any discussion of

---

6. Sahagian has done a poor job of explaining how the Treaty has operated to deny him these "rights." Article IX of the Treaty allows Sahagian such "remedies and recourses" as are provided by Spanish law. Sahagian does not explain what "remedies and recourses," if any, were either available to him or denied him. Moreover, we note that his contention that he was denied counsel appears inconsistent with the factual allegations in Sahagian's pro se complaint in which he alleged that he had retained an attorney in Spain.

We also note that Sahagian's claims appear to be based upon an exaggerated notion of the rights guaranteed persons in extradition proceedings in the United States. For example, there is a presumption against bail in extradition cases that can only be overcome by a showing of "special circumstances." *United States v. Leitner*, 784 F.2d 159, 160–61 (2d Cir.1986). Moreover, persons challenging extradition have only a limited right to challenge the evidence against them. "An accused in an extradition hearing has no right to contradict the demanding country's proof or to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains or clarifies that proof." *Eain v. Wilkes*, 641 F.2d 504, 511 (7th Cir.), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).

the complaint's factual allegations or citation to any relevant legal authority. This is simply insufficient to raise the argument on appeal. *See Ordower v. Feldman,* 826 F.2d 1569 (7th Cir.1987). Moreover, even if properly raised before us, the factual allegations in the complaint, as the district court noted, fail to raise above the level of simple negligence. This is inadequate to demonstrate the violation of a liberty interest such as that involved in this case. *See Daniels v. Williams,* 474 U.S. 327, 332–36, 106 S.Ct. 662, 665–67, 88 L.Ed.2d 662 (1986).

Thus, even if the district court had jurisdiction over the defendants, plaintiff could not prevail. The district court chose not to reach the issue of personal jurisdiction because it dismissed the complaint on the merits; we affirm that decision.

AFFIRMED.