Ralph L. BELL, Appellant,

v.

John J. CLARK, Warden, Federal Reformatory, Petersburg, Virginia, Appellee.

No. 14421.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 9, 1970.

Decided Feb. 5, 1971.

George E. Allen, Richmond, Va. (Allen, Allen, Allen & Allen, Richmond, Va., on the brief), for appellant.

Roger T. Williams, Asst. U. S. Atty., and Captain John T. Lenga, Dept. of the Army (Brian P. Gettings, U. S. Atty., and David G. Lowe, Asst. U. S. Atty., and Lt. Col. Arnold I. Melnick, Dept. of the Army, on the brief) for appellee.

Before BRYAN and WINTER, Circuit Judges, and MARTIN, Chief District Judge.

ALBERT V. BRYAN, Circuit Judge:

This habeas corpus cause is pressed by Ralph L. Bell under the circumstances described by the District Court as follows:

"Bell is presently confined to the Federal Reformatory, Petersburg, Virginia, as a consequence of a conviction by a general court martial for the crime of rape, as set forth in Article 120 of the Uniform Code of Military Justice, 10 U.S.C. § 920.

"The Court finds that on September 16, 1965, Bell was a Private First Class serving with the United States Army, 'A' Battery, 2d Battalion, 18th Artillery, then stationed in Germany. At the time of the offense for which he was convicted Bell was off duty, in civilian clothes, approximately five miles from the military base at which he had been quartered, and the victim of the crime was a German national. In short, and pursuant to judicial guidelines, the crime to which he pled guilty and for which he is now confined was non-service connected.

"Shortly after the commission of the crime Bell was apprehended and the German authorities waived the preliminary jurisdiction which accrued to them, * * *, pursuant to Article 19 of the North Atlantic Treaty Organization, Status of Forces Agreement. In accordance with said waiver by the German authorities a general court martial was convened at Giessen and Frankfort/Main, Germany, resulting in his conviction on January 24, 1966, wherein he was ordered to be dishonorably discharged from the service, to forfeit pay and allowances, and to be confined at hard labor for seven years and reduced to the grade of E–1. * * * * " [Citations omitted.]

Bell contends that the military court was without jurisdiction in that the crime was not service-connected. For this, he relies upon O'Callahan v. Parker, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), in which this argument was sustained in regard to such a crime committed in the then United States Territory of Hawaii where civil courts were open for his trial. That was the key to O'Callahan. "The offenses were committed within our territorial limits, not in the occupied zone of a foreign country". Id., at 273, 89 S.Ct., at 1691. In these circumstances, the Court declared that the accused was entitled to the rights conferred by Article III, and the Fifth and Sixth Amendments, including trial by jury, "presentment or indictment of a Grand Jury" and "a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have

been committed". Since instantly the crime was not perpetrated in such a venue, *O'Callahan* does not exclude court-martial. United States v. Keaton, 19 USCMA 64, 41 CMR 64 (Court of Military Appeals 1969).

Appellant's crime, as noted, was a violation of the Uniform Code of Military Justice, 10 U.S.C. §§ 801, et seq., 920. That statute defines the persons subject to the code in these terms:

"The following persons are subject to this chapter:

"(11) Subject to any treaty or agreement to which the United States is or may be a party or to any accepted rule of international law, persons serving with, employed by, or accompanying the armed forces outside the United States and outside the following: that part of Alaska east of longitude 172 degrees west, the Canal Zone, the main group of the Hawaiian Islands, Puerto Rico, and the Virgin Islands." 10 U.S.C. § 802(11).

This section is complemented by Article 17 stating that: "Each armed force has court-martial jurisdiction over all persons subject to this chapter". 10 U.S.C. § 817(a). As regards court-martial jurisdiction in a foreign country, these two provisions are reinforced by the Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces, 4 UST 1792. Gallagher v. United States, 423 F.2d 1371, 191 Ct.Cl. 546 (1970), cert. denied 400 U.S. 849, 91 S.Ct. 58, 27 L.Ed.2d 86 (1970). These enactments and this area of the Agreement are permitted by Article I, § 8, Clause 14 of the Constitution empowering Congress "To make Rules for the Government and Regulation of the land and naval Forces".

Executed by the parties to the North Atlantic Treaty, including the Federal Republic of Germany, on June 19, 1951, 63 Stat., pt. 2, p. 2241, it was ratified by the United States Senate on July 15, 1953, signed by the President on July 24, 1953, and became effective August 23, 1953.

The Preface of the Agreement outlines its aims and purposes:

"The Parties to the North Atlantic Treaty signed in Washington on 4th April, 1949.

"Considering that the forces of one Party may be sent, by arrangement, to serve in the territory of another Party;

\*    \*    \*    \*    \*    \*

"Desiring, however, to define the status of such forces while in the territory of another Party;

"Have agreed as follows:

\*    \*    \*    \*    \*    \*

### Article VII

"1. Subject to the provisions of this Article,

"(a) the military authorities of the sending State shall have the right to exercise within the receiving State all criminal and disciplinary jurisdiction conferred on them by the law of the sending State *over all persons subject to the military law of that State;*" (Accent added.)

Article I, § 1(f) gives this clarifying definition:

" 'military authorities of the sending State' [the United States] means those authorities of a sending State who are empowered by its law to enforce the military law of that State with respect to members of its forces or civilian components".

Undoubtedly Bell could have been prosecuted by the German civil authorities, for his acts were also punishable by German law. The Agreement in Article VII, sec. 3(b) provides:

"(b) In the case of any  \*  \*  \* [concurrent] offence the authorities of the receiving State shall have the primary right to exercise jurisdiction."

■ Considering the plan of the Agreement, we think the provisions just quoted unequivocally preserve jurisdiction in the United States military authorities in Germany over crimes committed there by American soldiers, notwith-

standing that the crime was not perpetrated within the territory of the United States occupation. The Agreement discloses a purpose to channel jurisdiction of an offender like Bell to the military authorities of his nation to the exclusion of every other United States court.

▆ Acceptance of the Agreement's provisions is compulsory upon all courts of the United States, for the Agreement, having the form and force of a treaty, is given supremacy by Article VI, cl. 2 of the Constitution:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; * * * "

Moreover, it conforms to Article III, § 2, cl. 3 of the Constitution, directing that:

"The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but *when not committed within any State*, the Trial shall be *at such Place or Places as the Congress* may by Law have directed." (Accent added.)

Congress in ratifying the Agreement has met the command of this section, by declaring that trials of servicemen stationed abroad be conducted where United States military authorities are present to exercise jurisdiction.

▆ The court-martial's jurisdiction is not subordinate to the Act of Congress, 18 U.S.C. § 3238, passed pursuant to Article III, stating that:

"The trial of all offenses begun or committed upon the high seas, or *elsewhere out of the jurisdiction of any particular State or district*, shall be in the district in which the offender, or

any one of two or more joint offenders, is arrested or is first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one of two or more joint offenders, or if no such residence is known the indictment or information may be filed in the District of Columbia." (Accent added.)

▆ This statute does not clothe the serviceman with any vested privilege. In our view, Article VII of the Agreement, providing court-martial trial for offenses committed abroad, is not incompatible with the statute. The treaty-making authority evidently designed Article VII to meet the special exigencies of a foreign occupation. This was its right. To read Article VII otherwise would disrupt the whole pattern of the treaty. This part of the Agreement is impliedly an assurance to the "receiving State" that those servicemen of the "sending State" who break the former's laws should be tried immediately. Expedition would be defeated if the offender could not be punished by the American military authorities in Germany. This prohibition might well discourage the referral of the accused to the "sending State", and substitute a trial in the "receiving State", as the latter may insist upon under the Agreement. Such a result would destroy the comity evinced by the signatories. We believe the treaty authorized, and the statute permitted, the court-martial of Bell.

The remaining question raised by the appellant of the retroactivity of *O'Callahan* is academic. We note that the issue has been presented in Relford v. Commandant, 409 F.2d 824 (10 Cir. 1970), cert. granted, 397 U.S. 934, 90 S. Ct. 958, 25 L.Ed.2d 114 (1970).

The District Court's dismissal was right.

Affirmed.