**In re Request from L. KASPER–ANSER-
MET, Examining Magistrate for the Re-
public and Canton of Geneva, etc.**

Misc. No. 88–432.

United States District Court,
D. New Jersey.

March 23, 1990.

Samuel A. Alito, Jr., U.S. Atty., by Rocco
C. Cipparone, Jr., Asst. U.S. Atty., Camden,
N.J., for petitioner U.S. on behalf of L.
Kasper–Ansermet.

John Sherman, Weisman, Celler, Spett &
Modlin, New York City, and Frederick J.
Dennehy, Wilentz, Goldman & Spitzer,
Woodbridge, N.J., for Salvatore Giordano
and Salvatore Giordano, Jr.

## JUDGMENT ORDER

RODRIGUEZ, District Judge.

This matter comes before the court on an
appeal by the United States of America
from Magistrate Jerome B. Simandle's or-
der filed on January 10, 1990 granting to

Salvatore Giordano, Sr. and Salvatore Giordano, Jr. a protective order prohibiting the Swiss Examining Magistrate from utilizing their attendance at a deposition to pronounce indictment against them.

The court, having considered the submissions of the parties, the oral presentation of counsel on February 16, 1990, and the applicable legal principles finds that the Magistrate's opinion and order of January 10, 1990 [1] are not clearly erroneous or contrary to law.

IT IS, therefore, on this 23rd day of March, 1990 ORDERED that the appeal of the United States of America is *DENIED* and the Magistrate's opinion and order are *AFFIRMED*.

## AMENDED OPINION

JEROME B. SIMANDLE, United States Magistrate:

This matter is before the court upon motion of Salvatore Giordano and Salvatore Giordano, Jr. (the "Giordanos") to quash deposition subpoenas served upon them by the United States Government acting on behalf of L. Kasper–Ansermet, the Examining Magistrate for the Republic and Canton of Geneva, Switzerland. The subpoenas were personally served upon the Giordanos in May, 1989,[1] to compel their appearance at a deposition in New Jersey before Assistant United States Attorney Cipparone on May 24, 1989 in aid of a Swiss criminal investigation and pursuant to the Treaty between the United States and the Swiss Confederation on Mutual Assistance in Criminal Matters, 27 U.S. Treaties 2019 [the "Treaty"] and 28 U.S.C. § 1782.

At a telephonic hearing, upon oral application of counsel for the Giordanos on May 17, 1989, the appearance date for the depositions was adjourned pending determination of the present motion. Thereafter, briefs and other submissions of counsel were submitted [2] and the oral arguments of counsel were heard [3] on June 2, 1989. The purpose of the depositions, as explained by Mr. Cipparone's letter of May 12, 1989, is "to ask the deponents whether they will voluntarily respond to questions supplied by the Swiss Government pursuant to a request for mutual assistance in connection with a Swiss criminal prosecution. In addition, their presence is required so that the Swiss Magistrate may pronounce indictment upon each of your clients."

This two-fold purpose of the deposition subpoenas—to obtain testimony if the Gior-

---

1. On March 13, 1990, the Magistrate entered an order making corrections to the grammar and syntax of this opinion.

1. The United States had previously obtained the addresses of the Giordanos pursuant to the order of this court in the present case, filed March 21, 1989, affirmed by Order filed April 14, 1989 by the Honorable Joseph H. Rodriguez.

2. Submissions on behalf of the Giordanos include: (a) Memorandum of Law in Support of Motions to Quash Subpoenas and for a Protective Order; (b) Affidavit of John B. Sherman, Esquire dated May 22, 1989 [hereinafter Sherman Affidavit] with Ex. A [copy of Treaty], Ex. B [copies of subpoenas and deposition notices], Ex. C [letter of Mr. Cipparone dated May 12, 1989], and Ex. D [letter of National Iranian Industries Organization, dated October 12, 1988]; (c) Affidavit of Jacques Wittmer, a member of the Bar of the Canton of Geneva, Switzerland, dated May 19, 1989; (d) Affidavits of S.A. Muscarnera, Esquire, Salvatore Giordano, and Salvatore Giordano, Jr., each dated May 18, 1989; (e) Reply letter of Mr. Shenkman, dated June 5, 1989, attaching Letter of Examining Magistrate Ansermet dated November 21, 1988, to Mr. Dominique Levy and Ms. Elizabeth Ziegler, attorneys for the Iranians before the Iran–United States Claims Tribunal at the Hague, and English translation thereof from the French, and also attaching letter of Jacques Wittmer dated June 1, 1989; (f) Letter of John B. Sherman, Esquire dated November 16, 1989, attaching "Additional International Letters Rogatory" dated September 15, 1988.

Submissions on behalf of the United States include (a) Government's Brief in Opposition, attaching Ex. 1 [Letter of Mr. Cipparone dated May 12, 1989], Ex. 2 [Opinion and Orders of March 21, 1989 and April 14, 1989], Ex. 3 [Technical Analysis of the Treaty], Ex. 4 [Transcript of Deposition of Enayat Behbehani, Case No. 88–Y–31 (D.Colo.) March 23, 1988]; (b) Telefax from L. Kasper–Ansermet, dated May 24, 1989, translated from the French; (c) excerpt from M. Cherif Bassiouni *International Extradition: United States Law and Practice* (1983).

3. No transcript of the June 2, 1989 argument exists because of an electronic recording malfunction. Counsel have not requested reargument for the record.

danos will give it, and to enable the Swiss Magistrate to "pronounce indictment" pursuant to Swiss law—gives rise to the present motion to quash. The Giordanos argue that the subpoenas should be quashed upon various grounds, including that (a) the subpoenas are not authorized by the Treaty, and (b) the Swiss proceedings do not conform with due process of law because of the prospect of trial *in absentia*, the staleness of the claims, and the Swiss non-recognition of the Giordanos' Fifth Amendment right to silence in the face of questioning. Moreover, the Giordanos argue that neither the Treaty nor 28 U.S.C. § 1782 with respect to international judicial assistance confer the power upon this court to compel them to appear for the purpose of hearing the Swiss Magistrate "pronounce indictment," which they allege is a stage of the Swiss prosecution akin to arrest and arraignment, as discussed further below.

## I. *Factual Background*

In 1975, it is alleged that the Fedders Corporation, of which the Giordanos are officers, allegedly sold a large quantity of refrigeration equipment to two Iranian companies, General Industrial Corporation and Loristan Refrigeration Industries, or their predecessors. By their Affidavits of May 18, 1989, the Giordanos allege that they were not directly involved in the negotiation of the transaction, but they remember that Fedders sold certain refrigeration machinery and equipment for approximately $9 million and was paid only $7 million, and that Fedders' investment in an Iranian company was expropriated without compensation by the Islamic Republic of Iran. Today Salvatore Giordano is Chairman of the Board of Rotorex Corporation, formerly Fedders Corporation, and Salvatore Giordano, Jr., is Vice Chairman of the Board and Chief Executive Officer of Rotorex.

In 1982, Fedders Corporation commenced a claim against the Iranian companies in the Iran–U.S. Claims Tribunal, which had been established at the Hague in the Netherlands, pursuant to the Iran–U.S. Claims Settlement Declaration, as discussed in the prior Opinion filed March 21, 1989 herein.

See also *United States v. Sperry Corp.*, —— U.S. ——, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989) and *Dames & Moore v. Regan*, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), for discussion of the Accords establishing the Tribunal. Fedders contends before the Iran–U.S. Claims Tribunal that it is owed $2,000,000 upon account, plus $4,000,000 in lost profits and compensation for the expropriation or nationalization of Fedders' property.

On May 31, 1982, Loristan filed a counterclaim against Fedders before the Claims Tribunal alleging fraud in this transaction. The Iran–U.S. Claims Tribunal proceedings continued forward without resolution, and a trial was held before the Tribunal on May 25, 1988. No decision has been rendered by the Tribunal, and it has been learned that a retrial is necessary due to the death of one of the Tribunal's jurists. The retrial was scheduled for June 5, 1989.

Meanwhile, in or about 1985, it is alleged by Fedders that the Iranians prompted the Swiss authorities to open a criminal investigation of the alleged fraudulent equipment sale. Examining Magistrate L. Kasper–Ansermet has conducted the investigation in Geneva, and Magistrate Kasper–Ansermet has "pronounced indictment" of Enayat Behbehani, who was the president of General Industrial Company (Behbehani Tr. 3/23/88 at 9), on March 24, 1988, at a proceeding in the U.S. District Court for the District of Colorado. That proceeding was not the product of a court order or judicial determination, other than the appointment of an Assistant U.S. Attorney as Commissioner to assist in the request for international judicial assistance. The "indictment" of Behbehani was for fraud under Articles 25 and 148 of the Swiss Criminal Code, alleging that the refrigeration equipment in question were sold as new to Loristan for $25,279,122, while the equipment was actually known to Behbehani to be used and repainted and worth about $9,000,000; Behbehani allegedly received $4.5 million personally and illegally from this transaction, from the sums paid out by Loristan. (Behbehani Tr. 3/24/88 at 18–19.) These transactions were described by the appointed Commissioner as "fraudulent

dealings" between Fedders Corporation in New Jersey, Fedders Engineering SA, in Geneva, Switzerland, and Blue Equities AG of Vaduz, Liechtenstein and Geneva (Behbehani Tr. 3/23/88 at 7), in which monies were allegedly paid on behalf of Loristan in a letter of credit at the Chase Manhattan Bank in Geneva, Switzerland, for the benefit of Loristan, and that the moneys were diverted and not received by Fedders Corporation in the United States. (*Id.* at 8.) Magistrate Kasper–Ansermet's indictment of Mr. Behbehani also names Mr. Bruno Giordano[4] and Mr. Elie Zion as participants in this scheme, although their alleged roles are unclear from the information before this court. (*Id.* at 18.)

The Giordanos allege that the Swiss investigation, including the present request for testimony, is not for criminal purposes but is instead an effort by the Iranians to subvert the exclusive civil jurisdiction of the U.S.–Iran Claims Tribunal. The Iranians have indeed indicated in the letter of National Iranian Industries Organization dated October 12, 1988, addressed to Fedders Corporation's attorneys in the Tribunal, that they have received access to the evidence gathered by the Examining Magistrate in Geneva, and some of that evidence is apparently summarized in that letter. The October 12th letter bluntly threatens to pursue further steps against Fedders and the Swiss penal claims against the Giordanos, but first invites Fedders' attorneys to negotiate the claims before the Tribunal.

The letter of November 21, 1988, from the Examining Magistrate to the Geneva attorneys for the Iranian companies confirmed certain information about the progress of the Swiss investigation, including the charges against Behbehani and that the Examining Magistrate was then seeking to learn the whereabouts of Salvatore Giordano, Senior and Junior. The Examining Magistrate's letter supplied the information at the request of the Geneva lawyers for the Iranian complainants, acknowledging that the information in the letter regarding the criminal investigation's status could be given to "the attention of Judge Michel Virally, Chairman Chamber Three of the Iran–United States Claims Tribunal." The Iranians apparently did submit the Examining Magistrate's letter to the Claims Tribunal in support of their counterclaim, without notice to their opponents from Fedders Corporation, according to counsel for the Giordanos herein.

I have held that the previous Swiss request for the Giordanos' addresses was made in connection with a criminal prosecution and not for the improper purpose of coercion or harassment by the Swiss authorities, and that this court is not the proper forum to adjudicate a claim of unethical or unlawful conduct of the Iranians with respect to their behavior before the Claims Tribunal. *See* Opinion of March 21, 1989, at 9, 10–11. I continue to have the impression that the Swiss investigation is primarily for criminal purposes, although it is troubling to learn that the Swiss Magistrate has shared information developed in his criminal investigation with the Iranians for their use before the Iran–U.S. Claims Tribunal, as demonstrated by the letters of October 12, 1988 and November 21, 1988, above. If the Magistrate's criminal allegations are correct, however, there is an ongoing investigation of an enormous criminal fraud, allegedly occurring in Switzerland, within the Magistrate's jurisdiction. He has brought charges against Mr. Behbehani and, according to AUSA Cipparone, the Examining Magistrate has continually represented to him that this criminal investigation is going forward against the Giordanos as well.

Again, the concerns of the Giordanos and Fedders Corporation as to the impropriety of the Iranians' conduct before the Claims Tribunal is best addressed to that forum, in which the Fedders Corporation is a litigant. It is indeed repugnant to any concept of fair play for the Iranians to make *ex parte* submissions to the Claims Tribunal without notice being given to their adversaries;

---

**4.** Mr. Bruno Giordano is not presently before this court. By Order of April 24, 1989, respondent Fedders Corporation was directed to supply the United States with Mr. Bruno Giordano's last known address.

such conduct before this court might, in fact, be grounds for dismissal of the offending party's claims.[5] Also, it would be unethical for a member of the bar of this court to threaten criminal action to gain an advantage in a civil negotiation, and the lawyer would be subject to appropriate discipline.[6] I would hope that the Claims Tribunal would require no lesser a standard of conduct from the Iranian attorneys who appear before it, but the court is without authority to enforce its rules of ethics as to conduct occurring before the Claims Tribunal.

We turn to consider the merits of the Swiss request.

## II. *Discussion of Law*

### A. *Propriety of Civil Subpoenas to Give Testimony for International Criminal Investigation*

The propriety of these civil subpoenas to compel the presence of the witness at a deposition before the appointed Commissioner is examined first.

■ The United States seeks to compel the Giordanos' appearances to obtain information or testimony from them and to establish their identities, *see* Government's Brief in Opposition at 2 n. 1. This testimonial purpose lies within the scope of the Treaty, which states in Art. 10, § 1:

> A person whose testimony or statement is requested under this Treaty shall be compelled to appear, testify and produce documents, records and articles of evidence in the same manner and to the same extent as in criminal investigations or proceedings in the requested State. Such person may not be so compelled if under the law in either State he has a right to refuse....

The compulsion to appear in Art. 10, § 1, above, is limited by the provision of Art. 4, § 1 that the requested State can use "only such compulsory measures as are provided in that State for investigations or proceedings in respect of offenses committed within its jurisdiction." This compulsion shall not include arrests, because the Treaty shall not apply to "extradition or arrests of persons accused or convicted of having committed an offense." Art. 2, § 1(a). Thus, the securing of testimony for a criminal investigation is a legitimate goal within the Treaty, while arrest is not.

The Giordanos have argued that the form of process selected by the United States to carry out the Swiss request—a civil subpoena under Rule 45 of the Federal Rules of Civil Procedure—is incompatible with the Treaty. The movants argue that the Treaty requires the use of analogous criminal procedures of the requested State —here, the procedures of the Federal Rules of Criminal Procedure for obtaining testimony in the course of an investigation. There is strong Treaty support for this position. For instance, Art. 9, § 1 states:

> Except as otherwise provided in this Treaty, a request shall be executed in accordance with the usual procedure under the laws applicable for investigations or proceedings in the requested State with respect to offenses committed within its jurisdiction.

Further, Art. 31, § 2 provides in pertinent part for the court's "jurisdiction, authority and power" as follows:

> The court or authority to which a request is transmitted shall have all of the jurisdiction, authority and power in executing the request which it has in investigations or proceedings with respect to an offense committed within its jurisdiction.

The phrase "law or procedure to be used in executing requests" is defined in the Treaty in Art. 40, § 1(e), as "the law or procedure ... which would ordinarily be used in comparable investigations or proceedings

---

5. Conduct of attorneys before this court is governed by the Rules of Professional Conduct of the American Bar Association, *see* General Rule 6 (U.S. District Court for the District of New Jersey). RPC 3.5(b) precludes *ex parte* contact between a litigant and a tribunal, except as permitted by law.

6. *In the Matter of Leo J. Barrett,* 88 N.J. 450, 454, 443 A.2d 678 (1982) [interpreting DR 7–105(A), predecessor of the current Rules of Professional Conduct, which precludes such criminal prosecutorial threats in aid of a civil commercial case. *See* C. Wolfram, *Modern Legal Ethics,* § 13.5.5 at 718 (1986)].

by the authority executing the request." This would suggest that the court to which this request is made should attempt to identify the comparable federal procedure for obtaining testimony during the course of a federal criminal investigation.

A civil subpoena under Rule 45, Fed.R. Civ.P., normally has no applicability in a federal criminal investigation. Instead, the procedure which would be used to compel a criminal suspect or target witness to appear for identification purposes and for questioning during the course of a criminal investigation would be a grand jury subpoena under Rules 17(a) & (c) of the Federal Rules of Criminal Procedure. Indeed, the Government's Brief admits as much, stating: "With respect to compelling the appearance of the Giordanos for deposition, the closest analogy in criminal proceedings in this country is the issuance of a grand jury subpoena to a witness or target of a criminal investigation." Government's Brief at 9.

The use of grand juries in response to a Swiss request is, in fact, authorized under the Treaty, which provides in Art. 31, § 2: "... In the case of a request by Switzerland, this paragraph shall authorize the use of *grand juries to compel the attendance and testimony of witnesses* and the production of documents, records and articles of evidence" [emphasis added].

The United States has not explained why it has proceeded by civil subpoena rather than by grand jury subpoena, other than to argue that the operative provisions of Rules 45(a) & (b) of the Federal Rules of Civil Procedure with respect to compelling testimony in civil litigation are essentially identical to the language for grand jury subpoenas under Rules 17(a) & (c), Federal Rules of Criminal Procedure. The Giordanos also note in their Memorandum of Law at 10, n. 1, that "Rules 17(a) and (c) authorize the issuance of subpoenas solely for the purposes of giving testimony and producing documentary and physical evidence

and, indeed, are virtually identical to Civil Rules 45(a) and (b)."

The issue then is reduced to whether the civil subpoenas used here are inconsistent with the Treaty's requirement for the use of procedures "which would ordinarily be used in comparable investigations or proceedings" under federal law for criminal investigation. If the treaty contained no more than the provisions quoted above, the civil subpoena might be adjudged an unauthorized procedure for use in this international criminal investigation. But Art. 31, § 3 clearly contemplates that the *court* would issue a procedural document to compel discovery:

> The court or authority to which a request is transmitted pursuant to paragraph 2 shall, when necessary, issue a procedural document in accordance with its own procedural law to require the attendance and statement or testimony of persons, or the production or preservation of documents, records or articles of evidence.

If a grand jury subpoena in execution of a Swiss request to compel testimony were the only available procedure, Art. 31, § 3 would be superfluous because the court-issued process of a civil subpoena would never be permitted for the criminal investigations contemplated by the Treaty. A grand jury subpoena, after all, is not a procedural document issued by the court, but is instead issued by a grand jury at the direction of the United States Attorney. A civil subpoena, on the other hand, is most certainly a "procedural document in accordance with its own procedural law to require the attendance and statement or testimony of persons." That is precisely what a civil subpoena does, under penalty of contempt of court in the event of non-compliance.

██ The language of Art. 31, § 3 is interpreted in the Technical Analysis of the Treaty [7] at 28 to specifically include a subpoena, stating:

> Paragraph 3 [of Art. 31] imposes an obligation on the executing authority to issue, when necessary, a subpoena or oth-

---

**7.** Technical Analysis of the Treaty Between the United States and Switzerland on Mutual Assistance and Switzerland on Mutual Assistance in Criminal Matters Signed at Bern, May 25, 1973 [Ex. 3 to Government's Brief].

er procedural documents in order to carry out the request.

Thus, the court holds that a civil subpoena to compel attendance of a witness for self-identification and testimony is an appropriate procedure under the Treaty. Alternatively, even if a civil subpoena were not in accordance with applicable Treaty provisions, it is a procedural document, issued under authority of the court to compel attendance and testimony of a witness, which is functionally identical in scope to a grand jury subpoena for these purposes; to reject the civil subpoena and to compel the Government to obtain and serve a grand jury subpoena for these purposes instead would elevate form over function. The spirit of the Treaty is to "provide ... for broad assistance between the United States and Switzerland in criminal matters ... includ[ing] assistance in ... the obtaining of statements and testimony of witnesses...." Technical Analysis, *supra*, at 1. The execution of a civil subpoena for purposes of compelling attendance and testimony of a witness, in lieu of a grand jury subpoena, is also consistent with the command of Art. 9, § 3, that judicial officers of such State *"shall, by all legal means within their power*, assist in the execution of requests from the other State." [Emphasis added.]

In addition, there is ample authority for use of a civil subpoena to compel the Giordanos' appearance and to obtain testimony pursuant to 28 U.S.C. § 1782. That statute addresses requests for international judicial assistance, including requests of a foreign nation for compelling an appearance and taking testimony of a person found within the federal court's jurisdiction. The statute further provides that such "testimony or statement shall be taken ... in accordance with the Federal Rules of Civil Procedure." Nothing in § 1782 limits its application to civil cases as opposed to criminal investigations or proceedings.

The subpoenas issued under authority of Rule 45, Fed.R.Civ.P., in this case are thus consistent with the exercise of this court's authority under 28 U.S.C. § 1782, and the Giordanos' argument to the contrary lacks merit.

For these reasons, this court finds that the civil subpoenas issued in this case are procedurally proper to compel the Giordanos' appearances at a deposition before the appointed Commissioner in connection with the Swiss criminal investigation.

B. *Objections based upon Due Process of Law*

The movants argue that the subpoenas should be quashed because the Swiss proceedings are fundamentally unfair and deny due process of law. They assert that the Swiss proceedings would permit trial and conviction *in absentia,* which is prohibited by the Sixth and Fourteenth Amendments.[8] Also, the tardiness of the Swiss proceeding allegedly substantially impairs the Giordanos' ability to defend themselves due to the passage of time, because the underlying refrigeration transaction occurred almost fourteen years ago, in October–December 1975.[9] Finally, the movants argue that the Swiss proceedings would violate the Fifth Amendment because, in the likely event that the Giordanos asserted their Fifth Amendment right of silence in response to questions posed on behalf of the Swiss Examining Magistrate herein, the fact of their silence would be revealed to a Swiss jury if their case came to trial; such a revelation to a jury would permit drawing an adverse inference from a defendant's refusal to testify, in violation of constitutional guarantees, see *Carter v. Kentucky,* 450 U.S. 288, 302, 101 S.Ct. 1112, 1120, 67 L.Ed.2d 241 (1981); *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). These are considered seriatim.

---

**8.** *Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970); *Lewis v. United States,* 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892).

**9.** The Affidavit of S.A. Muscarnera, dated May 18, 1989, alleges that the passage of time has

prejudiced the defense of these charges because two Fedders employees heavily involved in the transaction, Mr. Victor Melin and Mr. Herbert Berk, have died. *Id.* ¶ 3. Also, no current Fedders employee was directly involved in the transaction. *Id.* ¶ 4.

### 1. Trial in Absentia

Under Art. 234–238 and 330–333 of the Geneva Code of Criminal Procedure, a criminal trial may be held and a conviction obtained *in absentia*, that is, without the defendant's presence at such trial, according to the Affidavit of Jacques Wittmer at ¶ 4. [Mr. Wittmer is a Geneva attorney.] [10]

The Giordanos argue that any trial of the Giordanos would necessarily be held *in absentia* unless they chose to appear voluntarily. They further point out that Art. 2, § 1 of the Treaty precludes application of the Treaty to obtain extradition of persons accused or convicted of having committed an offense, so that the Treaty cannot be used to compel their extradition to Switzerland.

It is, of course, a sobering prospect that an American citizen would be tried and convicted *in absentia* under the laws of a foreign nation. Trial *in absentia* within the United States would be a violation of the Fifth and Sixth Amendments of the Constitution. *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970).

The Supreme Court has directed, however, that a federal court shall not require the foreign tribunal in which a criminal proceeding is pending to provide a process equivalent to the American protections of individual rights. *Neely v. Henkel*, 180 U.S. 109, 122–23, 21 S.Ct. 302, 306–07, 45 L.Ed. 448 (1901). The court rejected a constitutional challenge to an extradition statute, holding:

> The answer to ... [appellant's argument] is that those provisions [of the Constitution] have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country.... When an American citizen

commits a crime in a foreign country, he cannot complain if required to submit to such punishment as the laws of that country may prescribe for its own people, unless a different mode be provided for by treaty stipulations between that country and the United States.

Applying *Neely*, courts have upheld the extradition of a person whose West German trial and conviction would have been unconstitutional if it had occurred in the United States. *Holmes v. Laird*, 459 F.2d 1211 (D.C.Cir.), *cert. denied*, 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972). Incarceration in this country of American citizens convicted in foreign trials, even when those trials do not comply with the Bill of Rights, is not unconstitutional, *Pfeifer v. United States Bureau of Prisons*, 468 F.Supp. 920, 924, 926–27 (S.D.Cal.1979), *aff'd*, 615 F.2d 873 (9th Cir.1980). Likewise, due process under American law does not include a guarantee that the same protections will be extended to American citizens by the laws of another nation acting in accordance with that nation's traditional processes. *Gallina v. Fraser*, 177 F.Supp. 856, 866 (D.Conn.1959), *aff'd*, 278 F.2d 77 (2d Cir.1960); *In the Matter of Assarsson*, 635 F.2d 1237, 1244 (7th Cir.1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 325 (1981). Courts have also refused to inquire into the prospect that a foreign prosecutor's torture of a defendant played a role in obtaining the defendant's confession or conviction, *Escobedo v. United States*, 623 F.2d 1098 (5th Cir.1980); *Rosado v. Civiletti*, 621 F.2d 1179 (2d Cir. 1980).

This "rule of non-inquiry" still survives from *Neely v. Henkel*, although it is the subject of mounting criticism and hesitation by courts which may find other

---

**10.** Mr. Wittmer is a member of the firm of Helg, Picot, Wittmer & Vischer in Geneva, and he is a member of the Bar of the Canton of Geneva. His firm is retained by Fedders and the Giordanos in this matter, and his partner, Mr. Bernard Vischer, has on several occasions contacted Magistrate Kasper–Ansermet by telephone. The Magistrate offered the opinion that Mr. Vischer is "perfectly qualified to give any explanation that he deems necessary in regard to the principles of the penal proceedings in force in Gene-

va," *see* Additional Memorandum of L. Kasper–Ansermet, May 24, 1989. I find that Mr. Wittmer and Mr. Vischer are competent to express an interpretation of foreign law—here, the criminal procedures of the Canton of Geneva. Further, I am considering Mr. Wittmer's statements and Examining Magistrate Kasper–Ansermet's statements as relevant evidence of Geneva's criminal code and procedures in the case in my determinations of foreign law under Rule 44.1, Federal Rules of Civil Procedure.

grounds, arising from breach of treaty obligations by the requesting country, to deny extradition, *see Bassiouni, supra,* at § 7–1 through 7–9 (and cases cited therein).

■ In the present case, the prospect of trial and conviction *in absentia* in Switzerland does not preclude compliance with this Swiss request for assistance in this criminal investigation. First, there has been no trial *in absentia* in this matter; this is not a situation where the Swiss are seeking to identify and locate individuals who have actually been convicted *in absentia.* As the future unfolds, there may be no trial, or the defendants may choose to attend, or there may be an acquittal, or charges may be dropped. No one can say for sure. Second, the Treaty obligates American judicial assistance in this matter, notwithstanding the knowledge of the Treaty's ratifiers that the Swiss system's protection of rights of the accused is not the equal of our own. If a duty of inquiry were triggered by the Swiss request for assistance in this criminal matter, then it would be triggered in all such matters and assistance would be precluded if the hypothetical future Swiss trial would not protect U.S. constitutional rights. Under that scenario, the Treaty obligations would be undermined by general inquiry into the nature of rights protected by Swiss law in a hypothetical prosecution and trial. Such a duty of inquiry, at this stage of the proceedings, would thus be highly inappropriate, unless this right is addressed in the Treaty.

The treaty contains no direct reference to trials in person or *in absentia* before the foreign tribunal. Provisions of the Treaty dealing with service of documents suggest that if a U.S. citizen is served with a summons or subpoena to appear in Switzerland, the citizen may fail to comply and "shall not be subjected to any civil or criminal forfeiture, other legal sanction or measure of restraint because of his failure to comply therewith," Art. 24, § 1; this means that the Giordanos could not be arrested or otherwise sanctioned for failure to obey a Swiss trial summons or subpoena if one were served. This does not mean that a trial could not be held in Switzerland in their absence. The effect of an American's refusal to obey such a procedural document compelling attendance at trial in Switzerland would be governed by Swiss law in the underlying proceeding, Art. 24, § 2. Nonetheless, service of such a document here upon the U.S. citizen would not in itself confer jurisdiction in the Swiss court, Art. 24, § 3. Thus, even if a summons were served in this matter upon the Giordanos compelling their attendance in Switzerland,[11] the issue of whether the underlying Swiss criminal trial could go forward in the face of such refusal to attend would be governed by Swiss law under Art. 24, § 2.

The Swiss tribunal, in interpreting Swiss law, would also be bound to apply the safeguard of Art. 24, § 3, above, such that service of the trial summons or subpoena alone would not confer jurisdiction of the Swiss tribunal over the American citizen refusing to comply with the document. But the Treaty leaves open the possibility in Art. 24, § 2, that Swiss jurisdiction over the American citizen would have been acquired in some other way, and that the Swiss proceedings could go forward notwithstanding the absence of the defendants, if to do so accords with Swiss law. Therefore, the Treaty at least contemplates the possibility of the Swiss trial going forward without the attendance of defendants who have been summoned to appear. The prospect of trial of an American citizen *in absentia* in Switzerland is thus not incompatible with the rights of the accused specified in the Treaty. The text of the Treaty confers no specific protection against trial *in absentia,* and the Swiss request cannot be refused on this ground.

### 2. Statute of Limitations

■ The Giordanos claim that the subpoena should be quashed because the underlying Swiss investigation for conduct in

---

11. Of course, no Swiss trial summons or subpoena has been served in this matter. The Treaty preserves the right of the United States to effect the service of process upon its own citizens if requested by the Swiss to do so, if the citizen is a defendant in the Swiss criminal proceeding to which the request relates, Art. 22, § 2.

1975 exceeds the statute of limitations and that the transactions at issue are so stale that their ability to defend is severely impaired or even nonexistent. They point out that the analogous statute of limitations in the United States is 18 U.S.C. § 3282, a five year mail fraud statute that has expired almost three times over. They argue that such a prosecution in the United States would be barred, as a constitutional matter, by expiration of the U.S. statute of limitations. Finally, they argue that their defense has become impossible due to passage of time, death of important witnesses, and inability to locate other persons whose testimony could aid their defense.

These arguments are rejected for several reasons. First, the U.S. statute of limitations is irrelevant in determining whether to enforce a Swiss request for assistance obtaining testimony, as nothing in this Treaty prescribes a limitations period. See *Kamrin v. United States*, 725 F.2d 1225, 1227 (9th Cir.1984) [citing *Neely* and *Holmes, supra*]; *In the Matter of Extradition of Burt*, 737 F.2d 1477, 1486–87 (7th Cir.1984). Second, even if this court were to adjudicate whether the Swiss statute of limitations has expired for this offense (ignoring the inherent danger of error in construing foreign laws [12]), the Swiss Examining Magistrate has specifically addressed this point and demonstrated that the applicable Swiss statute of limitations does not expire until at least March of 1991.[13] Third, as a practical matter this court is in no position to judge the impact of delay upon the ability of the Giordanos to offer a defense, because this court has almost no knowledge of the details of the Swiss criminal case or the roles allegedly played by the Giordanos or their proposed witnesses in the underlying transactions. Fourth, if Swiss charges are brought, the Giordanos, if named as defendants, will have an opportunity to make "... [their] arguments about prejudicial prosecutorial delay [and other constitutional arguments and the alleged expiration of the Swiss statute] in the

courts of the prosecuting party," Switzerland. *In the Matter of Extradition of Burt, supra*, 737 F.2d at 1487.

This court holds that the passage of time since 1975 and the expiration of the U.S. statute of limitations does not bar enforcement of the subpoena to obtain the Giordanos' appearance and testimony.

### 3. Right to Remain Silent

■ The Giordanos argue that the Swiss request should be refused because the procedure does not protect their Fifth Amendment right to remain silent. They argue that they will, upon instruction of counsel, assert a Fifth Amendment right to remain silent and to refrain from answering any of the questions put to them by the appointed Commissioner, and they fear that the Treaty and Swiss law permit the Swiss court to draw adverse inferences at trial from their silence in refusing to give testimony, contrary to *Carter v. Kentucky* and *Griffin v. California, supra*.

The Giordanos' Swiss attorney, Mr. Wittmer, has testified in his affidavit that (a) the fact that the Giordanos asserted this right would be made known to the Swiss judge and jury, and (b) the court or jury would be free to draw an unfavorable inference from the Giordanos' assertion of their Fifth Amendment rights, including inferring guilt. (Wittmer Aff. ¶ 6.)

The text of the Treaty is instructive. Art. 10, § 1, provides in part:

A person whose testimony or statement is requested under this Treaty shall be compelled to appear, testify and produce documents, records and articles of evidence in the same manner and in the same extent as in criminal investigations or proceedings in the requested State. Such person may not be so compelled if under the law in either State he has a right to refuse. If any person claims that such a right is applicable in the requesting State, the requesting State shall, with respect thereto, rely on a cer-

---

**12.** *See, e.g., In the Matter of Assarsson, supra,* 635 F.2d at 1244; *Emami v. United States,* 834 F.2d 1444, 1449 (9th Cir.1987).

**13.** *Additional Memorandum of L. Kasper Ansermet, supra,* ¶ 2.

tification of the Central Authority of the requesting State.

Under Art. 13, a citizen of the requested state testifying as a witness must be "advised of his right to refuse testimony under paragraph 1 of Article 10," or the testimony obtained may not be introduced against the witness in criminal proceeding. Thus, the Treaty requires advising the witness of his right to refuse testimony.

Art. 14 provides that the requesting state may not subject a witness to any legal sanction solely because he exercised rights permitted under the Treaty, stating:

> No citizen of the requested State who has refused to give non-compulsory testimony or information or against whom compulsory measures had to be applied in the requested State pursuant to this Treaty shall be subjected to any legal sanction in the requesting State solely because he has exercised such rights as permitted under this Treaty.

Thus, the Giordanos argue that the Treaty specifically allows them to refuse to answer questions and prohibits the Swiss from penalizing the Giordanos based on such refusal. They fear that the Swiss authorities' use of the Giordanos' silence as evidence at the Swiss trial would violate the treaty by subjecting the Giordanos to a harsh legal sanction—a finding of guilt—arising solely from their invocation of their recognized right to refuse testimony.

A finding of guilt based solely upon refusal to testify would clearly violate Art. 14, because the Swiss authorities have agreed that no American citizen will be subjected to any legal sanction in Switzerland solely because the American citizen has exercised his right to silence. The Giordanos' argument boils down to a fear that their exercise of the Treaty right to refuse testimony may be the sole basis of a Swiss conviction, in violation of the Treaty. This court cannot presume that the Swiss authorities would violate their Treaty obligations. The Treaty does not, however, absolutely prohibit any use at trial of the fact of refusal to testify; the Treaty precludes the Swiss only from using the Giordanos' silence as the *sole* evidence supporting a guilty verdict. Otherwise, nothing in the Treaty alters the Swiss law's use of a defendant's refusal to testify as a source for adverse inference.

The interpretive statement concerning Art. 14 in the Technical Analysis of the Treaty, *supra,* supports the view that the Treaty provides only limited protection of the right to refuse to testify.[14] The drafters noted:

> Both delegations recognized that in many situations a sanction imposed could result from a number of factors, only one of which involved non-cooperation in a request under the Treaty, and it would, therefore, be difficult to determine how much weight could be attributed to the non-cooperation. Accordingly, the Article, as adopted, precludes any legal sanction being imposed in the requesting State against any citizen of the requested State *solely because he refused to give non-compulsory testimony or information or because compulsory measures had to be applied to obtain such testimony or information.* The term "non-compulsory" as used here permits a witness to insist on the use of compulsory measures to obtain his testimony or information and to exercise any right, recognized by the Treaty, to refuse to give such testimony or information. Therefore, *the exercise by a witness of any of these rights cannot, of itself, be*

---

**14.** It is noteworthy, and rather disappointing, that the United States' negotiators did not insist upon precluding Swiss evidentiary use of an American citizen's silence against him, where the defendant's appearance and testimony were procured through the Treaty's process. The Technical Analysis of the Treaty, *supra,* discloses that Art. 14 was "adopted at the insistence of the Swiss," rather than the United States. The Swiss feared "recriminatory action against Swiss nationals who failed to cooperate fully in a request under the Treaty." *Id.* The United States originally took the position that nothing in the Treaty should preclude sanctions against a witness who refuses to give testimony. The United States eventually urged a compromise position precluding retribution based *solely* upon refusal to give testimony. *Id.* As a result of the United States' position, a U.S. citizen's refusal to testify can still be introduced against him in a Swiss court, so long as it is not the *sole* basis of conviction.

*the basis for the imposition of a sanction against him in the requesting state.* [Emphasis added.]

Again, this means that the exercise of the right to refuse testimony cannot be used as the sole "evidence" supporting a Swiss conviction.

The sovereign states, in negotiating the Treaty, could have provided instead that no adverse use whatsoever would be made of the fact that a witness exercised his right to refuse to testify; they did not do so, and this court is not free to rewrite the Treaty to conform to the strictures of evidence before an American court. The drafters were presumably well aware that a Swiss court could use silence as evidence from which adverse inferences may be drawn, and they were aware of the Swiss system of "freedom of evidence," which permits admission in criminal cases of "all the evidence, direct and indirect [and] investigations," see Additional Memorandum of the U.S. Justice Department from the Examining Magistrate L. Kasper–Ansermet (dated May 24, 1989), at ¶ 5. The Treaty explicitly preserves this Swiss concept, indicating: "Provisions in this Treaty as to admissibility of evidence shall not affect the principle of free consideration of evidence insofar as the courts of Switzerland are concerned." Art. 40, § 4.

In summary, the Treaty does not provide support for a protective order precluding use of inferences arising from the exercise of the right to refuse to testify, so long as the exercise of such right is not the sole evidence supporting conviction, as provided in Art. 14. There are sufficient safeguards available to defendants under Swiss law to assure that Swiss authorities comply with Art. 14.

Finally, the fact that the Swiss court's protection of the right to remain silent is less absolute than our own cannot be a basis for refusing compliance with the Swiss request, as discussed above. As troubled as this court is with the prospect of use of a defendant's silence against him in the Swiss court, it is clear that a federal court shall not condition compliance with a requesting nation's petition upon a require-

ment that the requesting nation conform its criminal proceeding to provide the equivalent to the American protections of individual rights, under *Neely v. Henkel, supra,* and its progeny discussed above.

## C. *Objection to Pronouncement of Indictment by Swiss Magistrate*

■ The Giordanos' objection to the proposed pronouncement of indictment by the Swiss Magistrate raises troubling and fundamental issues of the purposes of the Treaty and of the international assistance statute, 28 U.S.C. § 1782. The United States has argued that the court has the obligation (under Art. 9, § 3) and the authority (under Art. 4, § 1 and Art. 10, § 1) to compel the appearance of the Giordanos for pronouncement of indictment. This court well recognizes that it is obligated to use "all legal means within [its] power ... [to assist] in the execution of request...." *Bell v. Clark,* 437 F.2d 200, 203 (4th Cir. 1971).

Under Article 9, § 3 this court is obligated to use all legal means within its power to assist in execution of Swiss requests. The authority of Article 4, § 1 above extends to employing "such compulsory measures as are provided in [the United States] for investigations or proceedings in respect of offenses committed within its jurisdiction." The United States argues that pronouncement of the Swiss indictment by the Swiss Magistrate in such a "proceeding" under Art. 4, § 1. Similarly, the United States cites the authority of Art. 10, § 1, above, with respect to compelling "[a] person whose testimony or statement is requested under this Treaty" to "appear, testify and produce documents ... in the same manner and to the same extent as in criminal investigations or proceedings in the requested State," arguing that the pronouncement of the Swiss indictment is again such a "proceeding."

The "pronouncement of indictment" under Swiss cantonal law does not have a ready analog in our criminal justice system.

Under the Geneva Code of Criminal Proceedings ["GPPG"] the Examining Magistrate conducts the criminal investigation

and decides whether the information is sufficient to bring charges. According to Article 134 of the GPPG, "as soon as the enquiries bring to light sufficient charges, the Examining Magistrate indicts the person who is the object of his preliminary investigation." The indictment must be pronounced in person by the Examining Magistrate, communicated to the defendant present in his chambers and recorded in the official minutes. *Id.*, quoted in Additional Memorandum of L. Kasper Ansermet, above, "Concerning 4."

The consequence of pronouncing indictment is that the Public Prosecutor will bring up the case for trial. [*Id.*, "Concerning 2," ¶ 3.] From that moment, "the proceedings of the investigation become adversary proceedings and the defendant has the right to be assisted by a lawyer." GPPG, Article 138. The defendant and his lawyer are summoned to all legal proceedings (GPPG, Article 143), may ask any pertinent questions, may request certain investigation actions (presumably in the nature of pretrial discovery) and may have access to the entire proceedings, Additional Memorandum of L. Kasper–Ansermet, above, "Concerning 3."

The pronouncement of indictment is thus a necessary stage of the pretrial process whereby the defendant is personally advised of the charge against him, is provided with an opportunity to inspect the Prosecutor's files and to prepare for the trial, which is conducted by the Public Prosecutor. The pronouncement of indictment makes the defendant susceptible to being summoned before the Swiss court to appear and defend himself. Pronouncement of indictment, in person and upon the official record, is a "hearing," as the Swiss Magistrate's Additional Letters Rogatory make clear that the Swiss wish to conduct "the hearing of Salvatore Giordano, Senior and Salvatore Giordano, Junior, for them to be charged and indicted...."

Whether pronouncement of indictment is the sort of proceeding for which the Giordanos' attendance may be required under Art. 4, § 1 and Art. 10, § 1 requires fur-ther analysis of the text and purposes of the Treaty.

The purposes of assistance under the Treaty include, but are not limited to, those items listed in Article 1, § 4, which includes in subsection (b) "taking the testimony or statements of persons." The other enumerated purposes concern gathering and authenticating information and serving judicial and administrative documents. No mention is made of actual conduct of the requesting state's judicial proceedings in the requested state. The Treaty, as mentioned above, explicitly *excludes* extradition or arrests of persons accused or convicted of having committed an offense, see Art. 2, § 1(a).

The drafters of the Treaty explained that the purposes of the Treaty involve furnishing assistance in criminal matters, in connection with "investigations or court proceedings." Technical Analysis of the Treaty, *supra*, at "Introduction." This assistance includes, according to the drafters, "assistance in locating witnesses, production and authentication of judicial and business records, and service of judicial or administrative documents." *Id.* The drafters explained that the Treaty "does not create any new crimes in either country. *It is limited to making available to each country evidence and information used by it in investigating or prosecuting the crimes established by its domestic law.*" *Id.* (emphasis added).

The Treaty's mention of "investigations or court proceedings" or "investigation or proceeding" (such as in Art. 1, § 1(a); Art. 4, § 1; Art. 7, § 2; Art. 9, § 1 & 2(a); Art. 10, § 1; Art. 31, § 2) nowhere appears in a context suggesting that a stage of a criminal trial can be conducted in the requested state. Instead, as the drafters noted, the mention of proceedings refers only to the underlying purpose or stage of the prosecution for which the information is sought, and not the actual conducting of a foreign trial proceeding in the requested state:

> The phrase "investigations or court proceedings" or "investigation or proceeding" is used to make it clear that the Treaty includes *mutual assistance at*

*the investigatory stage as well as at the trial stage.* The investigatory stage includes agency investigations and grand jury proceedings. Technical Analysis of the Treaty, *supra,* Art. 1 [emphasis added]. Thus, although the listing of types of judicial assistance under the Treaty is not exclusive, it appears that the information-gathering functions with which the Treaty so laboriously concerns itself do not include, and were not meant to include, the actual conduct of the requesting state's judicial proceedings against the accused in the requested state.

That the Treaty fundamentally pertains to assistance in exchanging information, rather than the conduct of judicial proceedings against the accused in the requested state, is shown again by reference to Treaty Art. 29, pertaining to the "Content of Requests." Art. 29, § 1(b) mandates that each request under the Treaty specify "the principal need for the evidence or information sought." If pronouncement of indictment were within the Treaty's functions, some reference to this proceeding would be expected in this Treaty requirement. The authority pronouncing indictment, of course, seeks no evidence or information; the authority instead imparts information to the accused, who becomes the defendant. Again, Art. 29 is inconsistent with the procedure of pronouncing indictment.

The United States similarly argues for permitting the Swiss Examining Magistrate to pronounce the Swiss indictment. This role for the Swiss Examining Magistrate is again beyond the permissible scope outlined in the Treaty. The Examining Magistrate is a representative of the requesting authority who has a right to attend the execution of the request, pursuant to Article 12, § 3. Other than being

present, the Examining Magistrate is only given the role of asking "questions which are not improper under the laws of either State," Treaty Article 12, § 4. The Treaty never indicates that the requesting authority's representative may conduct a judicial proceeding, such as the Swiss request here contemplates. Similarly, it is clear, by analogy, that the Treaty would not permit a United States Magistrate to go to Switzerland to conduct the arraignment of a Swiss citizen in connection with a U.S. criminal case against that Swiss citizen.

For these reasons, the court finds that the pronouncement of indictment is not authorized by the Treaty, and this aspect of the Swiss request finds no support under the Treaty.

The Swiss request to pronounce indictment likewise finds no support under 28 U.S.C. § 1782. That statute confers broad power upon federal courts to execute requests for international judicial assistance, *see John Deere Ltd. v. Sperry Corp.,* 754 F.2d 132, 134–35 (3d Cir.1985); *In re Letter of Request from the Crown Prosecution Service,* 870 F.2d 686, 692–93 (D.C.Cir. 1989). Section 1782 promotes international assistance for taking testimony or statements or production of documents or other things.[15] As discussed above, Section 1782(a) serves as a basis for compelling the attendance of a witness upon receipt of an appropriate request,[16] obtaining such document or statement in accordance with the Federal Rules of Civil Procedure,[17] as provided in section 1782 itself. But nothing in section 1782 suggests that a foreign sovereign may conduct its official criminal hearings in this country. No case has been found under section 1782 even remotely suggesting that this statute may be used to

---

**15.** 28 U.S.C. § 1782(a) provides in relevant part:

The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. The order ... may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court....

**16.** Indeed, in the present case, § 1782 is an independent source of authority for obtaining the attendance and statements under oath of the Giordanos, in addition to the Treaty authority, as discussed above.

**17.** Again, the civil subpoenas served upon the Giordanos in the present case under the Federal Rules of Civil Procedure suffice to compel their attendance and testimony under § 1782, in addition to the authority of the Treaty, as discussed above.

compel attendance at a critical and necessary stage of a foreign criminal proceeding, whether it be trial or pronouncement of indictment. This court can only conclude that it lacks the power under section 1782 to convene a hearing at which the Swiss Examining Magistrate may pronounce a Swiss indictment upon an American citizen.

Two additional factors support this result. First, pronouncing indictment would initiate the Swiss criminal proceeding leading to trial and would likely subject the defendants to the jurisdiction and authority of the Swiss court, to appear upon summons or risk trial *in absentia*. This gives rise to the prospect of circumventing the Treaty's bar of extradition of U.S. citizens to Switzerland. Second, pronouncing indictment is a sovereign act, a necessary and formal step of the Swiss criminal trial, amounting to the enforcement of Swiss criminal law upon the territory of the United States in a manner not contemplated by Treaty or statute; it is, of course, "axiomatic that one sovereign cannot enforce its criminal laws within the territory of another sovereign," *Tavarez v. U.S. Attorney General*, 668 F.2d 805, 810 n. 11 (5th Cir. 1982), in the absence of a treaty or statute authorizing such proceedings.

Accordingly, this court finds that neither the Treaty nor 28 U.S.C. § 1782 provide power or authority to permit the pronouncement of a Swiss indictment against the Giordanos, and the subpoena will not be enforced for purposes of pronouncing indictment. The Giordanos' motion for a protective order will be granted to this extent.

### III. *Conclusion*

This court will deny the Giordanos' motion to quash deposition subpoenas compelling their attendance and testimony, and they will be compelled to attend and testify (or attend and personally assert their right to remain silent to avoid self-incrimination) upon at least ten (10) days notice to their attorney. The court will grant the Giordanos' motion for a protective order precluding the pronouncing of a Swiss indictment against them at their depositions.

The accompanying Order is entered.